**TELEBRANDS CORP., Plaintiff,**

v.

**DEL LABORATORIES, INC.,
Coty U.S., and Coty, Inc.,
Defendants.**

**No. 09 Civ. 1001(NRB).**

United States District Court,
S.D. New York.

June 15, 2010.

Norman H. Zivin, Tonia A. Sayour, Wendy Ellen Miller, Cooper & Dunham LLP, New York, NY, for Plaintiff.

Lisa Pearson, Amr O. Aly, Kilpatrick Stockton LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff Telebrands brought this action against Del Laboratories, Inc., Coty U.S., and Coty, Inc. (collectively "Coty" or "defendants"). On August 11, 2009, Telebrands filed their Third Amended Complaint ("TAC") asserting the following claims, four of which are under federal law and two of which are under New York state law:

(1) patent infringement under Section 35 of the Patent Laws of the United States, 35 U.S.C. §§ 271, 289;

(2) registered trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1);

(3) federal unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

(4) copyright infringement under Section 501 of the 1976 Copyright Act, 17 U.S.C. § 101 *et seq;*

(5) common law unfair competition under New York law; and

(6) statutory unfair competition under New York General Business Law § 360–k.

Presently before the Court is defendants' motion to dismiss, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, we dismiss the federal unfair competition claim, the copyright claim and both state law claims. With respect to the remaining claims, defendants' motion to dismiss is denied and the parties are directed to conduct discovery focusing on the dispositive issue in this case.

## FACTUAL BACKGROUND [1]

Telebrands markets a product known as the Fed Egg, which is a foot file designed to remove calluses and dead skin from a user's feet. TAC ¶ 10. Coty markets a similar foot file known as the Pedi–Perfect, which is sold under the "Sally Hansen LA CROSS" brand. TAC ¶ 19.

The Ped Egg consists of three components that fit together neatly to form an ovoid shape which looks roughly like an egg (except that it is symmetrical, *i.e.,* the product has two tapered ends, rather than the off-center bulge of a natural egg). The product fits comfortably in the palm of the hand so that it can be gripped with ease. The Ped Egg's top component (the "handle") is a plastic, convex-curved ovoid that gives the whole product its egg-like appearance. The handle is white but displays a blue "Ped Egg Professional" logo along one side.

---

1. The following facts are derived from the allegations set forth in the TAC, together with those "documents attached to the complaint as an exhibit or incorporated in it by reference." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002). The Court assumes all alleged facts to be true for the purpose of deciding this motion to dismiss, and construes all alleged facts in the light most favorable to the plaintiff. *See Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006).

The middle component of the Ped Egg is a flat, stainless steel grater that contains 135 micro files sharp enough to remove calluses and dead skin. The grater and the handle clip together to form a complete, hollow shell so "that, when applied to the user's foot, the shavings are trapped inside. When these two components are combined on their own, the Ped Egg is in its active mode and is ready to use, with the sharp grater surface exposed.

The third component is a white, plastic cover with a flat base and sides. The cover fits over the grater and meets the handle neatly so that the whole makes a contiguous ovoid shape, but with a flat base. The cover and the handle do not meet along a flat plane, but rather along curved or wavy sides. When all three components are assembled, the product is in its inactive, storage mode.

The Ped Egg is sold in a clear "blister"[2] package that displays the product alongside marketing text and a picture of the product being used on a foot. TAC ¶ 14. On the reverse side of the package there are more pictures, instructions for how to use the product, and two full paragraphs of text. The text states, *inter alia*, that the Ped Egg is "economically designed to fit perfectly into the palm of your hand for easy and convenient use." The phrase "ergonomic design" appears four times on the Ped Egg packaging, once on the front and three times on the back.

The Ped Egg is the subject of a design patent that protects the product's "ornamental design." U.S. Design Patent No. D596,802 (issued July 21, 2009);[3] TAC Ex.

B. The design patent is owned by International Edge, Inc., who is not a party to this suit. TAC ¶ 11. International Edge also submitted a utility patent application for the Ped Egg, which, at the time defendants filed this motion before the Court, was pending before the United States Patent and Trademark Office ("PTO"). U.S. Patent Application No. 12/074,603 (filed March 4, 2008). According to the PTO's public records, that application has since been rejected on the grounds that the Ped Egg's innovations would have been "obvious to one of ordinary skill" based on previously existing devices. U.S. Patent Application No. 12/074, 603, "Final Rejection" (issued March 17, 2010) ¶ 8. However, since there remains an opportunity to appeal the rejection, no "final denial" has yet been rendered on the utility patent application. *See* Defs. Letter to the Court, dated May 17, 2010.

International Edge is also the registrant of a federal trademark for the Ped Egg product configuration. U.S. Trademark Registration No. 3,633,750 (issued June 9, 2009); TAC ¶ 12. This trademark protects the configuration of the Ped Egg foot file, "specifically, the entire implement." TAC Ex. C. The Ped Egg packaging is the subject of a copyright issued to International Edge on October 18, 2007. U.S. Copyright Registration No. VA 1–629–218; TAC ¶ 15. This copyright protects the two-dimensional image of the Ped Egg packaging, both the front and the back. TAC Ex. E.

Telebrands is the exclusive licensee of International Edge's intellectual property

---

**2.** "Blister" packaging is comprised of a preformed plastic case around paperboard card and commonly used for a variety of consumer goods.

**3.** The Court may properly take judicial notice of official records of the United States Patent and Trademark Office and the United States

Copyright Office. *See Island Software and Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 261 (2d Cir.2005) (copyright registration); *Duluth News–Tribune v. Mesabi Publ'g Co.,* 84 F.3d 1093, 1096 n. 2 (8th Cir.1996) (trademark registration).

rights in the Ped Egg. TAC ¶¶ 11, 12, 15. The two companies entered a License Agreement in which International Edge grants Telebrands an "exclusive, royalty-free, license to make, distribute and sell the [Ped Egg and related products] throughout the United States, its territories and possessions, and over the internet, including the right to sublicense others." Decl. of A.J. Khubani in Support of Pl.'s Application for a Limited TRO and Preliminary Injunction, Ex. 3 (the "License Agreement") § 1. Telebrands is also granted the right to assert the intellectual property rights in the Ped Egg and to "maintain any action against others in its own name." License Agreement § 6. The agreement further provides:

[International Edge] need not be joined as a party to any such action to the extent permitted by applicable law. [International Edge] will join any action brought by Licensee [i.e., Telebrands] upon request. Licensee also shall have the authority to send in Licensee's own name cease-and-desist letters to infringers of the [intellectual property] [r]ights. Licensee will bear the legal fees and any expenses of infringement actions and oppositions and will keep any damages awarded and any settlement payments.

Id.

Telebrands sells the Ped Egg through direct response television marketing and through major retail stores. TAC ¶ 13. According to plaintiff, the Ped Egg is a great commercial success, with approximately twenty-two million units sold. TAC ¶ 16; Khubani Decl. to PTO ¶ 4. Telebrands claims to have expended millions of dollars advertising and promoting the Ped Egg on television, on the internet and in print. TAC ¶ 16.

Coty sells the Pedi–Perfect product though national retailers, including retailers that also sell the Ped Egg. TAC ¶ 21.

The Pedi–Perfect is a white, ovoid foot file of approximately the same size as the Ped Egg. The Pedi–Perfect contains three components that work essentially in the same manner as the Ped Egg, although the product is assembled differently. The top component or handle is a plastic, convex-curved ovoid with slight indentations on either side. According to the packaging, these "finger indents" provide a secure grip on the product. The handle is all white and has "Sally Hansen" written in raised lettering in the middle.

The Pedi–Perfect is sold in a blister pack that contains the three components of the foot file as well as a toe-spacer and nail clipper. The toe-spacer is bright pink in color, shaped as the silhouette of a foot, and displayed at the top left quadrant of the pack. The handle of the foot file (i.e., the white curved component that gives the product its recognizable shape) is mostly concealed by a raised portion of the blister pack. The reverse side of the pack shows pictures of the product being used and contains directions and marketing text.

Plaintiff alleges that Coty's Pedi–Perfect product infringes Telebrands' intellectual property rights in the Ped Egg and has caused Telebrands monetary and reputational harm. TAC ¶ 25.

## PROCEDURAL BACKGROUND

Plaintiff filed the first complaint in this action on February 4, 2009, seeking various forms of relief including a preliminary injunction against Coty to enjoin them from selling the Pedi–Perfect product. Later that month, plaintiff substituted their counsel, filed the First Amended Complaint and moved for a temporary restraining order ("TRO") and preliminary injunction. Both parties appeared before the Court for oral argument on the requested TRO on February 27, 2009 (the "TRO Oral Argument"). The Court de-

nied the TRO from the bench and plaintiff subsequently withdrew their motion for preliminary injunction. Plaintiff substituted their counsel again on June 23, 2009, returning to the counsel that originally represented them; plaintiff's new counsel then filed the Second Amended Complaint.

On August 7, 2009, the Court so ordered a stipulation entered by the parties, stating that defendants would consent to plaintiff filing a third amended complaint in exchange for plaintiff agreeing not to seek to file any additional amended complaint thereafter (with one exception not pertinent to this motion). Telebrands filed the TAC on August 11, 2009. Defendants then brought this motion to dismiss "or, in the alternative, for summary judgment" pursuant to Fed.R.Civ.P. 12(b)(6), 12(d). Following extensive briefing from both parties, this Court held oral argument on the present motion on April 23, 2010 (the "MTD Oral Argument").

## LEGAL STANDARDS

A motion to dismiss may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Still v. DeBuono*, 101 F.3d 888, 891 (2d Cir.1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Courts ruling on motions to dismiss must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in the plaintiff s favor. *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir.2007).

To survive a motion to dismiss, a complaint must include "enough facts to state a claim for relief that is plausible on its face.". *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Where plaintiffs have not "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* This pleading standard applies in "all civil actions." *Ashcroft v. Iqbal*, — U.S. ——, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009) (internal quotations omitted).

## DISCUSSION

Defendants raise a number of arguments in support of their motion to dismiss, which we consider in turn.

### I. Standing

#### A. Patent Infringement Claim (Count I)

In Count I of the TAC, Telebrands asserts a claim for design patent infringement under 35 U.S.C. §§ 271 and 289. Defendants contend that Telebrands lacks standing to bring this claim since Telebrands is not the owner of the patent, but rather an exclusive licensee. Mem. in Support of Defs. Motion to Dismiss ("Defs. Mem.") 4–6. For the reasons stated below, we find that Telebrands has standing on the patent infringement claim.

Section 281 of Title 35 of the United States Code states that "[a] patentee shall have remedy by civil action from infringement of his patent." For purposes of the statute, a patentee includes the successors in title to the patentee, such as an assignee. *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed.Cir. 1998). An exclusive licensee ordinarily may not sue in its own name alone, but must join the patent owner in an action brought against an accused infringer. *See Waterman v. Mackenzie*, 138 U.S. 252, 255–56, 11 S.Ct. 334, 34 L.Ed. 923 (1891); *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed.Cir.1998); *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1130–31 (Fed.Cir.1995); *see also* Lawrence M. Sung & Jeff E. Schwartz, *Patent Law*

*Handbook* § 7:3 (2008–09 ed.). However, courts permit exclusive licensees to bring suit in their own name, without joining the patent owner, if the exclusive licensee holds "all substantial rights" in the patent, becoming, in effect, an assignee (and therefore a "patentee" within the meaning of Section 281). *See Durel Corp. v. Osram Sylvania Inc.,* 256 F.3d 1298, 1301 n. 1 (Fed.Cir.2001); *Textile Prods.,* 134 F.3d at 1484; Fed. Judicial Ctr., Patent Case Management Judicial Guide § 2.2.1.1.1 (2009). "All substantial rights" usually include the right to sue for infringement (without leave of the patent owner) and the right to grant licenses; courts look to the intention of the parties and examine the substance of what was granted to the licensee in order to determine whether the licensee has obtained all substantial rights. *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA,* 944 F.2d 870, 874–75 (Fed.Cir.1991); Fed. Judicial Ctr., *Patent Case Management Judicial Guide* § 2.2.1.1.1 (2009).

Telebrands asserts a patent infringement claim against Coty, but has not joined the registered patent owner, International Edge. In the TAC, Telebrands pleaded simply that it is the exclusive licensee of the Ped Egg design patent, but did not state that Telebrands held "all substantial rights" in the patent and did not plead facts from which a court could make such a determination. TAC ¶ 11. In response to defendants' motion to dismiss, Telebrands submitted the affidavit of the company's CEO, A.J. Khubani, which stated that (i) Telebrands held "all substantial rights" in the patent under the license agreement with International Edge, and (ii) if necessary, Telebrands could now add International Edge as a voluntary party. Khubani Decl. in Support of Pl.'s Opp'n to Defs. Motion to Dismiss ¶¶ 4–5.

■ The Khubani affidavit does not remedy the pleading deficiency for several reasons. First, affidavits are inadmissible to cure a defect in the complaint on a motion to dismiss. *See Adler v. Aztech Chas. P. Young Co.,* 807 F.Supp. 1068, 1072 (S.D.N.Y.1992). Second, the parties entered a stipulation so-ordered by the Court under which plaintiff agreed not to further amend their pleadings after the TAC (the fourth complaint in this litigation). Although Telebrands now offers to join International Edge as a party, we are not inclined to ignore the parties' negotiated agreement by granting Telebrands a fifth bite at the apple in the form of yet another amended complaint. Third, Telebrands failed to provide the best evidence to demonstrate that it holds "all substantial rights" in the patent: namely, the License Agreement between Telebrands and International Edge.

However, we may properly consider the parties' License Agreement in this case because, apparently unbeknownst to plaintiff's current counsel, the License Agreement became part of the Court's record when plaintiff's prior counsel submitted it as an exhibit to their motion for a TRO. Khubani Decl. in Support of Pl.'s Application for TRO, Ex. 3; *see Chambers,* 282 F.3d at 153 (court may consider documents in the record alongside plaintiff's allegations on a motion to dismiss). Accordingly, we examine the License Agreement to determine whether it grants Telebrands all substantial rights in the Ped Egg design patent.

As each license is unique, we " 'must ascertain the intention of the parties and examine the substance of what [the license agreement] granted' to determine if it conveys all of the substantial rights in the patent and is sufficient to grant standing to the licensee." *Sicom Systems, Ltd. v. Agilent Technologies, Inc.,* 427 F.3d 971,

976 (Fed.Cir.2005) (quoting *Prima Tek II, L.L.C. v. A–Roo Co.,* 222 F.3d 1372, 1378 (Fed.Cir.2000)). Courts have looked particularly at whether the license agreement grants the licensee the right to sue for infringement. *See* Fed. Judicial Ctr., *Patent Case Management Judicial Guide* § 2.2.1.1.1 (2009).

Under the License Agreement in this case, International Edge grants Telebrands the right to sue infringers in its own name and without joining the patent owner "to the extent permitted by applicable law." License Agreement § 6. The existence of such a provision is considered dispositive on the question of whether a license agreement grants a licensee all substantial rights in the patent. *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA,* 944 F.2d at 875. In *Vaupel,* the Federal Circuit considered a license agreement that granted an exclusive licensee the right to sue for infringement, subject only to the obligation to notify the patent owner; the court held that the licensee had standing on its patent claim and noted that the licensee's right to sue for infringement "is particularly dispositive here because the ultimate question confronting us is whether [Licensee] can bring suit on its own or whether [Patent Owner] must be joined as a party." *Id.* For the same reasons, Telebrands, whose right to sue infringers does not even require notice to the licensor, has standing under the License Agreement.[4]

In addressing the standing issue at oral argument, defendants' counsel argued that the License Agreement does not confer all substantial rights for three reasons: (1) nothing in the agreement deprives International Edge of the right to sue for infringement; (2) the agreement fails to state that International Edge has not retained any rights to exploit the Ped Egg in the United States; and (3) International Edge has retained the right to veto an assignment of Telebrands' rights under the agreement. MTD Oral Argument Tr. 9–10. We find that none of these concerns is sufficient to deny Telebrands standing. Defendants' first two arguments focus on the rights that International Edge may have retained that are *not* expressed in the License Agreement. Yet those hypothetically retained rights do not vitiate the provisions of the agreement granting Telebrands all the rights to sell the Ped Egg in the United States and to enforce its intellectual property rights. On reading the express terms of the License Agreement, it is clear that granting Telebrands all substantial rights was the parties' primary intent, which is the central focus of the standing analysis. *See Sicom Systems,* 427 F.3d at 976.

Turning to defendants' third argument, International Edge's right to veto an assignment by Telebrands does not alter the result. This provision is worded in a neutral fashion, giving each party the right to assign their rights under the agreement "only with the written consent of the other party." License Agreement § 11. Moreover, the right to veto an assignment is not core to the parties' agreement and does not fundamentally alter the allocation of rights between Telebrands and International Edge. *See Vaupel,* 944 F.2d at 875 (holding that the patent owner's sublicensing veto did not preclude a finding that the

**4.** We note also that the License Agreement provides virtually no restriction on the scope of Telebrands' rights in the Ped Egg throughout the United States. Telebrands has the right to sell the Ped Egg royalty-free "throughout the United States, its territories and possessions, and over the internet" and the right to sublicense others. License Agreement § 1. The agreement is effective as long as Telebrands complies with the agreement and Telebrands and International Edge "remain cooperative entities." *Id.*

licensee held all substantial rights because the sublicensing veto power "was a minor derogation from the grant of rights" and "did not substantially interfere with the full use by [Licensee] of the exclusive rights under the patent").

Finally, we note that granting Telebrands standing comports with public policy. One policy underlying the requirement to join the patent owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer. *See Vaupel,* 944 F.2d at 875–76 (citing *Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 38, 43 S.Ct. 254, 67 L.Ed. 516 (1923)). This policy is not undercut here since the License Agreement clearly envisions that Telebrands, and not International Edge, would be the entity protecting the Ped Egg intellectual property in the United States.[5] Thus, there is no concern that International Edge would file a separate suit against Coty in this instance. Another policy behind the standing requirement is to allow a patent owner to enforce his monopoly as he chooses. *See Crown Die & Tool,* 261 U.S. at 40–41, 43 S.Ct. 254 (citing 3 *Robinson on Patents* § 937 (1890)). Here, however, International Edge voluntarily ceded its right to be joined as party to infringement actions and would clearly suffer no harm from Telebrands' suit against Coty.

In sum, Telebrands holds all substantial rights in the Ped Egg design patent and therefore has standing to assert the patent infringement claim. Since defendants raise no further argument in support of dismissing Count I of Telebrands' suit, the motion to dismiss is denied with respect to the patent claim.

## B. Registered Trademark Infringement Claim (Count II)

Telebrands' second count is for federal registered trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). Defendants raise the same standing argument on this claim, asserting that Telebrands did not join the registrant of the trademark, International Edge, and that an exclusive licensee cannot ordinarily bring an independent claim to enforce the registrant's trademark. Defs. Mem. 6–7. We find that Telebrands has standing on this claim principally for the same reasons described above with respect to Telebrands' standing to assert the patent claim.

The Lanham Act provides that an action for trademark infringement may only be brought by the "registrant," and further defines that term to include the legal representatives, predecessors, successors and assigns of the registrant. 15 U.S.C. §§ 1114(1), 1127. Some courts have applied a bright line rule that exclusive licensees lack standing because they do not fit within this definition. *See Tap Publications v. Chinese Yellow Pages (New York) Inc.,* 925 F.Supp. 212, 217 (S.D.N.Y.1996); *In re Houbigant, Inc.,* 914 F.Supp. 964, 990 (S.D.N.Y.1995), *clarified in part,* 914 F.Supp. 997 (S.D.N.Y.1996);[6] *see also* J.

---

**5.** Under the License Agreement, Telebrands (a) has the right to send cease-and-desist letters to infringers, (b) bears the legal fees and any expenses of infringement actions, and (c) is entitled to keep any damages or settlement payments resulting from such actions. License Agreement § 6.

**6.** We note that each of these cases involved infringement claims brought by licensees against their licensors. They are distinguishable from the present case, where Telebrands brings suit against a third party infringer, Coty, and not the licensor, International Edge. This distinction weighs in favor of granting Telebrands standing, since permitting Telebrands to enforce the trademark would result in no harm to the licensor.

Thomas McCarthy, 6 *McCarthy on Trademarks and Unfair Competition* § 32:3 (4th ed.2010) (expressing author's belief that exclusive licensees should not have standing under Lanham Act § 32(1)). Other courts have taken the position that an exclusive licensee who has a property interest in the trademark qualifies as an assignee of the registrant for standing purposes. *See Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 339 F.Supp.2d 944, 959–60 (W.D.Mich.2004); *Ultrapure Systems, Inc. v. Ham–Let Group*, 921 F.Supp. 659, 665–66 (N.D.Cal.1996); *National Football League Properties v. Playoff Corp.*, 808 F.Supp. 1288, 1291 n. 2 (N.D.Tex.1992); *Shoney's, Inc. v. Schoenbaum*, 686 F.Supp. 554, 563 (E.D.Va.1988), *aff'd*, 894 F.2d 92 (4th Cir.1990); *see also* Jerome Gilson, 3 *Gilson on Trademarks* § 11.02 ("Most courts hold that a truly exclusive licensee has rights closely akin to trademark ownership and hence has standing to sue. Under this rationale, an exclusive license is equated with an assignment since no right to use is reserved to the licensor, and the licensee's standing derives from its presumed status as an assignee.").

The only Second Circuit guidance on this issue is a decision from 1980 affirming the denial of standing to an exclusive distributor of the registrant's product where the parties' agreement expressly stated that the distributor had no rights "whatsoever" in the mark. *DEP Corp. v. Interstate Cigar Co., Inc.*, 622 F.2d 621, 622–23 (2d Cir.1980). The Circuit concluded that "[i]n the face of such explicit language, it is obvious that [plaintiff] is not an assignee expressly or impliedly of the trademark allegedly infringed by [defendant]." *Id.* at 622. Similarly, in *Calvin Klein Jeanswear Co. v. Tunnel Trading*, a court in this District denied standing after applying the rule that an exclusive licensee only has standing if the licensing agreement

"grants the licensee a property interest in the mark or otherwise assigns to the licensee the registrant-licensor's ownership rights." No. 98 Civ. 5408(THK), 2001 WL 1456577, at *4–5 (S.D.N.Y. Nov. 16, 2001).

■ Both the Second Circuit in *DEP* and the Southern District of New York in *Calvin Klein*, while concluding that the plaintiffs in those cases lacked standing, looked to the terms of the license agreement to determine whether the licensee held a property interest in the mark, becoming effectively an assignee for standing purposes. We therefore apply the same analysis and consider whether Telebrands was granted a property interest in the Ped Egg. As discussed in detail above, *see* Part I.A, the License Agreement grants Telebrands broad rights to sell the Ped Egg throughout the United States, royalty free, for a potentially unlimited period. License Agreement § 1. Additionally, the contract does not set forth any restrictions on Telebrands' ability to enforce the trademarks or other intellectual property of the Ped Egg. License Agreement § 6. Under these circumstances, Telebrands has a property interest in the trademark and qualifies as an assignee of the registrant for standing purposes. Accordingly, Telebrands has standing on the registered trademark infringement claim (Count II).

## II. Substantial Similarity

### A. Copyright Infringement (Count IV)

Telebrands asserts a claim under Section 501 of the 1976 Copyright Act, alleging that Coty infringed Telebrands' copyright in the two-sided PED EGG product packaging. U.S. Copyright Registration No. VA 1–629–218 (issued Oct. 18, 2007); TAC Ex. E. Coty moves to dismiss this claim on the grounds that the Pedi–Perfect packaging is not substantially similar to the copyrighted work.

■■ The elements required to establish a *prima facie* case of copyright infringement are "ownership of a valid copyright" and "copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). To establish the second element, a plaintiff must demonstrate that: " '(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's.'" *Hamil America, Inc. v. GFI,* 193 F.3d 92, 99 (2d Cir.1999) (quoting *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* 71 F.3d 996, 1002 (2d Cir.1995)). For the purposes of this motion, Coty concedes the existence of a valid copyright and the fact that actual copying occurred.[7] Defs. Mem. 20–21; MTD Oral Argument Tr. 22. The operative question is therefore whether the two works are substantially similar.

■ The standard test for substantial similarity between two items is whether an " 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 111 (2d Cir.2001) (quoting *Hamil America,* 193 F.3d at 100). This so-called "ordinary observer test" asks whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Knitwaves Inc.,* 71 F.3d at 1002 (internal quotation marks omitted). When the works contain "both protectible and unprotectible elements," we "must attempt to extract the unprotectible elements from our consideration and ask whether the protectible elements,

standing alone, are substantially similar." *Id.* (emphasis omitted). However, "we are principally guided by comparing the contested design's total concept and overall feel with that of the allegedly infringed work, as instructed by our good eyes and common sense." *Peter F. Gaito Architecture, LLC v. Simone Development Corp.,* 602 F.3d 57, 66 (2d Cir.2010) (internal quotations and citations omitted).

The issue of substantial similarity typically presents a question of fact. *See Durham Indus., Inc. v. Tomy Corp.,* 630 F.2d 905, 911 (2d Cir.1980); *Arnstein v. Porter,* 154 F.2d 464, 468–69 (2d Cir.1946). However, the Second Circuit recently clarified that in certain circumstances the district court can make a determination as to substantial similarity on a Rule 12(b)(6) motion to dismiss:

> [w]here, as here, the works in question are attached to a plaintiff's complaint, it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation. If, in making that evaluation, the district court determines that the two works are "not substantially similar as a matter of law," *Kregos v. A.P.,* 3 F.3d 656, 664 (2d Cir.1993), the district court can properly conclude that the plaintiff's complaint, together with the works incorporated therein, do not "plausibly give rise to an entitlement to relief." *Iqbal,* 129 S.Ct. at 1950.

*Gaito Architecture,* 602 F.3d at 64. The Circuit then affirmed the District Court's dismissal of the copyright infringement claim, concluding that "no 'average lay observer would recognize the alleged copy as having been appropriated from the copy-

---

7. There is no issue concerning standing on the copyright infringement claim because the Copyright Act expressly authorizes an exclu-

sive licensee to bring a copyright infringement claim under 17 U.S.C. §§ 101 and 501(b).

righted work.' " *Id.* at 66 (quoting *Knit-waves Inc.,* 71 F.3d at 1001).

■ Applying these legal standards to the present case, we may confidently conclude that the Pedi–Perfect packaging is not substantially similar to the copyrighted Ped Egg packaging as a matter of law. Telebrands identifies the following characteristics of the Ped Egg packaging: (1) clear "blister" pack; (2) blue text on a white background with one yellow element; (3) Ped Egg logo with a foot silhouette; (4) metal filing cartridge displayed through clear packaging; (5) raised section at the bottom with a curve; and (6) three pictures in a row on the reverse side. TAC ¶ 14; MTD Oral Argument Tr. 23–24.

■ First, many of the features Telebrands identifies are not protectible because they are not original. In assessing substantial similarity, "we are required to determine whether any alleged 'similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking.' " *Gaito Architecture,* 602 F.3d at 67 (quoting *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.,* 338 F.3d 127, 134–35 (2d Cir.2003)). Even works that express enough originality to be protected can also contain material that is not original, and hence that may be freely used by other designers. *Tufenkian Import/Export,* 338 F.3d at 132. Creative works are permitted to draw on "the common wellspring that is the public domain," including the use of "elemental 'raw materials,' like colors, letters, descriptive facts, and the catalogue of standard geometric forms." *Id.*

In the present case, most of the features that Pedi–Perfect and Ped Egg packaging have in common are non-protectible raw materials: the use of a clear blister pack; a color scheme that includes blue (albeit different shades) and yellow on a white background; and the silhouette of a foot. Another feature Telebrands identifies, the display of a metal cartridge through a blister pack, seems to be ubiquitous in packaging for foot files: this feature appears in six out of seven "alternate designs" that Telebrands submitted to the Court in opposing this motion. *See* Pl.'s Opp'n Mem. Exs. A, C, D, E, F, G.

■ Other elements of the copyrighted packaging, which could arguably be protectible, reveal significant differences between the Ped Egg and the Pedi–Perfect packaging. The raised section at the bottom of the Pedi–Perfect package has a concave curve and conceals beneath it the white ovoid handle of the foot file. The Ped Egg package's raised section has a convex curve and its only purpose is aesthetic. While it is true that both packages have a series of three pictures on the reverse side, pictures one and three in the series depict different things: the Pedi–Perfect is shown twice being used on a foot, while the Ped Egg is shown being used on a balloon and then being emptied into a trash can. The second picture on both packages shows the foot file in a person's hand, ready to use. The pictures are concededly similar, although this one feature alone provides an insufficient basis for a finding of substantial similarity when comparing the whole works.[8]

Finally, even a casual glance at the two packages reveals that the "total concept

---

8. Furthermore, photographs are only copyrightable when they exhibit the necessary originality. *See Oriental Art Printing, Inc. v. Goldstar Printing Corp.,* 175 F.Supp.2d 542, 547 (S.D.N.Y.2001). There is nothing original about the second picture; rather, it serves a purely utilitarian purpose because it instructs the consumer in how to hold the foot file correctly.

and overall feel" of the works are very different. *Gaito Architecture*, 602 F.3d at 66. While the Ped Egg package contains only the foot file, the Pedi–Perfect offers consumers two additional footcare products which are included in the package: a nail clipper and a toe-spacer. Both items are displayed prominently at the top left quadrant of the pack and the toe-spacer is an eye-catching bright pink color. The resulting effect is to draw attention to the "bonus" items offered with Pedi–Perfect but not with the Ped Egg. In addition, the pink toe-spacer gives the Pedi–Perfect package a markedly different color scheme than the Ped Egg, notwithstanding the presence of other shared colors.

The substantial similarity analysis requires conducting a comparison with "good eyes and common sense." *Gaito Architecture*, 602 F.3d at 66. Even applying the standard with the greatest of caution, we find that no ordinary observer could find Coty's package to be substantially similar to the copyrighted work. Defendants' motion to dismiss the copyright infringement claim (Count IV) is therefore granted.

## III. Functionality

■ In Counts II and III of the TAC, Telebrands seeks to protect the Ped Egg product trade dress, asserting claims under the Lanham Act for registered trademark infringement and federal unfair competition. The Lanham Act does not protect functional features, since it is a "well-established rule that trade dress protection may not be claimed for product features that are functional." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (citation omitted). Defendants argue that the Lanham Act claims should be dismissed because "Telebrands has not pleaded and cannot plead that its alleged product trade dress is non-functional."

Defs. Mem. 7. Since the two claims involve different pleading requirements and burdens of proof on the issue of functionality, we consider each of the Lanham Act claims separately.

### A. Federal Unfair Competition Claim (Count III)

Telebrands asserts a federal unfair competition claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), alleging that Coty infringed the unregistered trade dress of the Ped Egg, which consists of both the product design and the product packaging. Coty contends that Telebrands has failed to state a claim under § 43(a) because the TAC does not allege that the Ped Egg trade dress is non-functional, which is an essential element of the claim. In addition, Coty argues that Telebrands should not be permitted to amend its complaint because the parties stipulated that Telebrands would not submit any further pleadings after filing the TAC on August 11, 2009.

■ The Second Circuit has enunciated four pleading requirements for a claim under § 43(a) based on the appearance of a product:

(1) plaintiff must allege "the claimed trade dress is non-functional;" (2) plaintiff must allege "the claimed trade dress has secondary meaning;" (3) plaintiff must allege "there is a likelihood of confusion between the plaintiff's good and the defendant's;" and (4) plaintiff must "offer a precise expression of the character and scope of the claimed trade dress."

*National Lighting Co., Inc. v. Bridge Metal Industries, LLC*, 601 F.Supp.2d 556, 560–61 (S.D.N.Y.2009) (quoting *Sherwood 48 Assoc. v. Sony Corp. of America*, 76 Fed.Appx. 389, 391 (2d Cir.2003)). With respect to the first element, plaintiff bears the burden of proving non-functionality,

*see* 15 U.S.C. § 1125(a)(3), and there is a "statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection." *TrafFix,* 532 U.S. at 30, 121 S.Ct. 1255.

None of the four complaints that Telebrands has submitted in this case contain an allegation that the Ped Egg trade dress is non-functional. In opposing this motion to dismiss, Telebrands now argues that (i) the description of the Ped Egg trade dress as "arbitrary and fanciful" in the TAC is sufficient to satisfy the requirement to plead non-functionality, and/or (ii) the omission of language relating to functionality was an "oversight" which can now be corrected by amending the pleading. Pl.'s Opp'n Mem. 11–12; MTD Oral Argument Tr. 13.

▪ With respect to plaintiff's first argument, we note that the adjectives "arbitrary" and "fanciful" are not interchangeable with "non-functional." Some devices may be described as arbitrary and fanciful even though they have a function, such as a paperclip. Yet even if "arbitrary and fanciful" would suffice to convey the idea of non-functionality in ordinary speech, in the context of trademark law the phrase is a term of art that specifically relates to a different element of an infringement claim, distinctiveness.[9] The protections of trademark law increase with the distinctiveness of a mark; Judge Friendly articulated four levels of distinctiveness of which "arbitrary or fanciful" marks are the most distinctive and the easiest to protect. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). Distinctiveness and non-functionality are clearly separate issues in the sphere of trademark law, since

product trade dress that is functional "is ineligible for protection regardless of its inherent or acquired distinctiveness." Restatement (Third) of Unfair Competition § 17 cmt. a; *see National Lighting,* 601 F.Supp.2d at 563 n. 8 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 767, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). Accordingly, Telebrands' description of the Ped Egg trade dress as "arbitrary and fanciful" does not satisfy plaintiff's burden to plead non-functionality.

Turning to plaintiff's second argument, we are skeptical about the explanation that plaintiff's counsel inadvertently neglected to mention non-functionality in any of the pleadings. As defendants contend in their motion to dismiss, there is a logical and less benign reason why Telebrands may have wished to omit language that described the Ped Egg trade dress as non-functional: namely, Telebrands had entered an application for a utility patent which was then pending before the PTO. Although the PTO has since rejected that application, Telebrands was actively pursuing a utility patent at the time that they brought this action, and Telebrands' CEO submitted supplementary materials in support of the application as recently as February 1, 2010. *See* Khubani Decl. in Support of Patent Application, filed with the PTO, pursuant to 37 C.F.R. § 1.132. Telebrands' application repeatedly emphasized the "ergonomic" shape of the Ped Egg in order to persuade the PTO that the device contained a "useful improvement" on previously existing foot files. *See* 35 U.S.C. § 101 (patent may only be granted for a "new and useful process, machine, manufacture, or composition of matter, or

---

**9.** The Supreme Court has held that product design trade dress can never be classified as "inherently distinctive," therefore the element of distinctiveness in the product design context must be established by showing that the

design has acquired secondary meaning in the marketplace. *Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 212–16, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

any new and useful improvement thereof"). The application stated that one of the objects of the Ped Egg "is to provide a skin removing device with an ergonomic design to increase comfort and prevent fatigue in the user's hand while the device is being used." U.S. Patent Application No. 12/074,603, filed March 4, 2008, 10013. The application also stated that, in one embodiment:

> the skin removing device is designed so that the handle and the cover have an ergonomic shape when connected so that the skin removing device can be comfortably held by a user while removing skin with abrasive surface. One such shape is the egg or generally ovoid shape shown in FIGs. 1–7.

*Id.* at ¶ 0030. In light of such statements to the PTO, it seems likely that someone at Telebrands, or Telebrands' old or new counsel, made a strategic choice not to plead that the Ped Egg's ovoid shape was non-functional.

Another consideration, which is even more significant here, is that Coty had put Telebrands on notice that the first amended complaint had failed to plead non-functionality. At the oral argument on Telebrands' application for a TRO, defendants' counsel stated: "[P]art of plaintiff's burden is to prove that this product trade dress is not functional. And the complaint in this case and the amended complaint in this case, I think, is susceptible to a motion to dismiss because that very basic allegation has not been made." TRO Oral Argument Tr. 14–15. While we note that Telebrands has replaced its counsel since the date of that argument, Telebrands' new counsel acknowledged their obligation to familiarize themselves with the record in this case and represented that they had read all the papers. MTD Oral Argument Tr. 14.

■ Despite this history, Telebrands now seeks leave to correct the omissions in the TAC by submitting a fifth complaint, in breach of the parties' stipulated agreement so-ordered by the Court on August 7, 2009. Defs. Mem. 12 n. 8. When a party seeks the Court's leave to amend a pleading, the Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Justice would not be served if we permitted a fourth amended pleading by a plaintiff who was forewarned of the relevant defect in complaint, had a strategic reason for pleading as it did, and voluntarily stipulated that there would be no further amendments. Accordingly, Telebrands' request to amend the TAC to include an allegation that the trade dress is non-functional is denied.

■ Since Telebrands has failed to plead an essential element of a federal unfair competition claim under § 43(a) of the Lanham Act,[10] defendants' motion to dismiss Count III is granted.

## B. State Unfair Competition Claims (Counts V and VI)

Telebrands also asserts unfair competition claims under New York statutory and common law. TAC §§ 45–54. As counsel

---

**10.** Telebrands' failure to plead non-functionality is fatal to this claim as it relates to both product design and product packaging trade dress. Functional features of product packaging also cannot be protected as trade dress. *See Malaco Leaf, AB v. Promotion In Motion, Inc.,* 287 F.Supp.2d 355, 373 (S.D.N.Y.2003) (use of functional packaging such as cellophane packet with clear front window does not give rise to suit for trade dress infringement) (citing McCarthy, 1 *McCarthy on Trademarks and Unfair Competition* §§ 7:63, 8:20 (4th ed.2003)); Siegrun D. Kane, *Trademark Law: A Practitioner's Guide* § 3.2.1. n. 4 (4th ed.2002) ("functionality may also come into play in packaging, *e.g.,* a blister pack is useful to allow the buyer to see what is inside a sealed package").

for Telebrands conceded at oral argument, these state law claims stand or fall with the federal unfair competition claim. MTD Oral Argument Tr. 10; *see Information Superhighway, Inc. v. Talk America, Inc.*, 395 F.Supp.2d 44, 56 (S.D.N.Y.2005) (elements of common law unfair competition claim mirror Lanham Act claim; complaint dismissed); *BOA (UK) Ltd. v. Ideaville.Com LLC*, No. 02 Civ. 2473(SHS), 2002 WL 32093544, at *1 (S.D.N.Y. Oct. 8, 2002) (unfair competition claim under N.Y. Gen. Bus. Law dismissed because dependent on dismissed § 43(a) Lanham Act claim). Accordingly, the motion to dismiss Telebrands' state law claims is granted.

### C. Registered Trademark Infringement (Count II)

In contrast to the federal unfair competition claim under Lanham Act § 43(a), a claim for registered trademark infringement under § 32(1) of the Act does not require the plaintiff to plead non-functionality. A certificate of trademark registration is prima facie evidence of the validity of a trademark and relieves the holder of the trademark of the burden of proving non-functionality in an infringement suit. 15 U.S.C. § 1057(b). Following the amendment of the Lanham Act in 1998, functionality is a statutory affirmative defense to a claim under § 32(1), with the burden of proof on the defendant. 15 U.S.C. 1115(b)(8); McCarthy, 1 *McCarthy on Trademarks & Unfair Competition* §§ 7:72, 7:84 (4th ed.2010). Since the Ped Egg product configuration is the subject of a registered federal trademark, U.S.

Trademark Registration No. 3,633,750, Telebrands has no obligation to plead non-functionality in the complaint to assert an infringement claim under § 32(1).

■ The remaining question is whether, at this stage, Coty has satisfied their burden of proof on the defense that the trademark-protected Ped Egg trade dress is functional. The issue of whether a trade dress is functional is "essentially a fact question." *R.F.M.A.S., Inc. v. Mimi So*, 619 F.Supp.2d 39, 80 (S.D.N.Y.2009) (citing *Coach, Inc. v. We Care Trading Co., Inc.*, 67 Fed.Appx. 626, 629 (2d Cir.2002)). In addition to considering evidence about the utilitarian advantages of the trade dress, courts look to four factors that bear on the issue of functionality: (1) the existence of a utility patent that discloses the utilitarian advantage of the design sought to be registered as a trademark; (2) advertising by the design owner touting the design's utilitarian advantages; (3) the lack of alternate designs; and (4) the comparative simplicity or cost saving resulting from the method of manufacturing the article. *In re Morton–Norwich Products, Inc.*, 671 F.2d 1332, 1340–41 (C.C.P.A.1982); Kane, *Trademark Law, A Practitioner's Guide* § 3.2.1 (4th ed.2002).[11]

■ Addressing the first of the *Morton–Norwich* factors, we note that the Ped Egg was the subject of a utility patent application, U.S. Patent Application No. 12/074, 603, which represented that the Ped Egg is "a skin removing device with an ergonomic design to increase comfort and prevent fatigue in the user's hand

---

**11.** The Supreme Court's decision in *TrafFix*, 532 U.S. 23, 121 S.Ct. 1255, left some uncertainty about the relevance of alternate designs in the functionality analysis. *TrafFix* held that once a district court has determined that a device is functional, it is not necessary "to speculate about other design possibilities." 532 U.S. at 24, 121 S.Ct. 1255. However, the

Federal Circuit has held that the *Morton–Norwich* factors for determining functionality, including availability of alternative designs, still applied after *TrafFix*. *See Valu Engineering, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed.Cir.2002); McCarthy, 1 *McCarthy on Trademarks & Unfair Competition* § 7:75 (4th ed.2010).

while the device is being used." This representation appears to be an admission by Telebrands, in a document publicly filed with the PTO, that the Ped Egg product configuration is functional. Telebrands has a duty of candor and good faith in filing a patent application with the PTO. 37 C.F.R. § 1.56(a). In this action, Telebrands takes the opposite position on functionality while seeking to use the Court's resources to enforce its intellectual property rights. We fail to see how Telebrands can take both positions in good faith.[12]

However, it is unclear what weight should be given to Telebrands' utility patent application in light of the fact that it has been rejected by the PTO. The Supreme Court has held that the presence of an expired utility patent application is "strong evidence" of functionality. *Traf-Fix*, 532 U.S. at 29–30, 121 S.Ct. 1255. This is because an actually-issued patent requires a conclusion by the PTO that a device was sufficiently useful and inventive to merit granting the patentee a monopoly. *See* 35 U.S.C. § 101. The Federal Circuit has also taken into account representations of utilitarian advantages expressed in an abandoned utility patent application. *Valu Engineering*, 278 F.3d at 1279 ("[A]n applied-for utility patent that never issued has evidentiary significance for the statements and claims made in the patent application concerning the utilitarian advantages, just as an issued patent

has evidentiary significance."); Defs. Letter to Court, dated April 28, 2010. In the present case, the Ped Egg utility patent application has been rejected by the PTO, yet it remains pending in the absence of a "final denial." *See* Defs. Letter, dated May 17, 2010. It is logical that, under the first *Morton–Norwich* factor, the representations in Telebrands' rejected application weigh less towards a finding of functionality than they would if a utility patent had actually been granted.

On the second *Morton–Norwich* factor, defendants have a strong argument that the relevant Ped Egg features are functional. The Ped Egg packaging touts the product's utilitarian features, describing the foot file as "ergonomically designed to fit perfectly into the palm of your hand for easy and convenient use," and repeating the phrase "ergonomic design" four times. On the other hand, the third and fourth *Morton–Norwich* factors seem to support Telebrands' position that the Fed Egg trade dress is non-functional. Telebrands has submitted evidence of several foot files in shapes and colors that are different from the Ped Egg, suggesting that there is no lack of alternate designs. *See* Pl.'s Opp'n Mem. Exs. A–G. Additionally, Coty does not claim that the Ped Egg design benefits from the simplicity or cost-saving of its manufacturing technique.

■ We therefore face a situation where factors weigh on both sides of the

---

**12.** It is possible that the doctrine of judicial estoppel prevents Telebrands from taking an inconsistent position on functionality here. "The doctrine of judicial estoppel is that where the party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed.Cir.1996). The doctrine is "designed to prevent the perversion of the judicial process," and the decision whether to invoke judicial estoppel lies within the

court's discretion. *Id.* However, "[a] party has not displayed bad faith for judicial estoppel purposes if the initial claim was never accepted or adopted by a court or agency." *Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 778 (3d Cir.2001) (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805, 119 S.Ct. 1597, 1603, 143 L.Ed.2d 966 (1999)). Since the PTO has so far rejected Telebrands' patent application, no agency has accepted Telebrands' position on functionality. Accordingly, we do not apply judicial estoppel at this time.

functionality determination. Considering that Coty bears the burden of proof against the presumption of non-functionality that accompanies a federally registered trademark, this factual issue cannot be resolved in Coty's favor on a motion to dismiss. Accordingly, defendants' motion to dismiss the registered trademark claim is denied.

### D. Limited Scope of Discovery

While we find that functionality cannot be resolved on this motion, the issue of functionality will be dispositive for Telebrands' claims that survive summary judgment, namely, the design patent and registered trademark claims. Telebrands must establish that the relevant features of the Ped Egg are non-functional because a design patent protects only the ornamental, non-functional aspects of a device. *Lee v. Dayton–Hudson Corp.*, 838 F.2d 1186, 1188–89 (Fed.Cir.1988); McCarthy, 1 *McCarthy on Trademarks and Unfair Competition* § 6:11 (4th ed.2010). Similarly, with respect to Telebrands' registered trademark claim, the Lanham Act does not protect trade dress features that are functional. *TrafFix*, 532 U.S. at 28, 121 S.Ct. 1255. Since Telebrands' other claims are dismissed pursuant to this decision, Coty would have a complete defense if it were able to prove that the Pedi–Perfect only appropriates the functional, non-protectible features of the Ped Egg design or trade dress.

Accordingly, the parties are directed to conduct discovery limited to the threshold issue of whether the relevant Ped Egg features are functional, before engaging in costly discovery that pertains to other aspects of Telebrands' claims. In order to do so, it is incumbent upon Telebrands to identify the allegedly non-functional features of the Ped Egg design or trade dress that Telebrands seeks to protect. Thus far in the litigation, Telebrands has altered its position several times on which aspects of the product it alleges are non-functional. Defendants submitted to the Court an exhibit that summarizes Telebrands' shifting positions and highlights the inconsistencies at various stages of the case. *See* Defs. Mem. Appx. A. At oral argument on the motion to dismiss, Telebrands presented another novel theory about which aspect of the Ped Egg was non-functional.[13] Defendants in civil litigation should not be expected to mount a defense upon shifting sands; the time has arrived for Telebrands to articulate their position with clarity.

### CONCLUSION

For the reasons stated above, defendants' motion to dismiss is granted in part and denied in part. The motion is denied with respect to Telebrands' patent and registered trademark infringement claims (Counts I and II) and is granted with respect to all other claims (Counts III, IV, V, and VI). At the present time, any discovery conducted by the parties shall be limited to the dispositive issue of functionality, as consistent with this opinion. The parties are directed to submit a proposed discovery schedule, appropriate to this defined issue, to the Court by June 29, 2010. **IT IS SO ORDERED.**

---

**13.** Plaintiff's counsel suggested at oral argument that the much-advertised ergonomic properties of the Ped Egg related only to the central bulge of the ovoid handle, since it was this element that fits in the palm of the hand, while the tapered ends of the ovoid shape were non-functional. MTD Oral Argument Tr. 31–34. However, this argument assumes that Ped Egg users will hold the product sideways, *i.e.*, at ninety degrees to the angle at which the Ped Egg packaging shows the product being used. When held as directed on the package, the entire ovoid shape, including the tapered ends, fits neatly into the hand.