4

**BLT RESTAURANT GROUP LLC,
f/k/a BLT Management LLC,
Plaintiff,**

v.

**Laurent TOURONDEL, Michael
Cinque and LT Burger,
Inc., Defendants.**

No. 10 Civ. 6488 (MHD).

United States District Court,
S.D. New York.

Feb. 22, 2012.

6

Julian David Schreibman, Sara G. Spiegelman, William B. Wachtel, Wachtel & Masyr, LLP, New York, NY, Elliot Silverman, Wachtel & Masyr, LLP, Irvine, CA, for Plaintiff.

David A. Kalow, Milton Springut, Tal S. Benschar, Kalow & Springut LLP, Ralph R. Hochberg, Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, New York, NY, for Defendants.

### MEMORANDUM & ORDER

MICHAEL H. DOLINGER, United States Magistrate Judge.

Plaintiff BLT Restaurant Group ("BLT") commenced this lawsuit to assert a variety of claims—one federal and the others based on state law—in the wake of the departure of defendant Laurent Tourondel from his contractual relationship with plaintiff. Until Tourondel's withdrawal, he played a central role in designing the food and related practices of a number of restaurants opened under the name BLT. He now operates and is opening another series of restaurants in conjunction with other investors.

Currently before the court are three motions, two by defendants. Defendants seek dismissal of a portion of the current amended complaint for lack of supplemental jurisdiction, and they ask for summary judgment on one claim and a portion of a second claim, also from the current complaint. Plaintiff has moved for leave to serve a second amended complaint, which would add claims, reorganize some of the current claims, and insert some further factual allegations. For the reasons that follow, we deny defendants' motion to dismiss, grant plaintiff's motion to amend, and deny all but a sliver of defendants' motion for partial summary judgment.

### PROCEDURAL BACKGROUND

Plaintiff filed suit in mid–2010. As embodied in its current pleading—the Amended Complaint—BLT asserted eight claims against Tourondel, some of which it also pressed against an associate of Tourondel named Michael Cinque and an entity known as LT Burger, Inc., which was formed by the two individual defendants. In substance, plaintiff alleged that it had entered into a contractual arrangement with Tourondel, an accomplished French chef, under which Tourondel was to work with plaintiff in developing a series of restaurants using the trade name BLT (for Bistro Laurent Tourondel). (Am. Compl. ¶¶ 10–17). According to BLT, after these restaurants had attained substantial critical and financial success, Tourondel left (as was his contractual right) to set up his own restaurants with other financiers under

the trade name LT, and he has in fact opened one such establishment in Sag Harbor, and intends to open others. (*Id.* ¶¶ 38–39, 60). Plaintiff complained, however, that in doing so Tourondel had violated his contractual obligations in a variety of respects and has engaged in unfair competition by the use of "proprietary" or "confidential" information belonging to plaintiff. This alleged wrongful conduct is said to include the copying of recipes originally used in dishes featured in the BLT restaurants, the use of names for dishes that imitated the fanciful names utilized in the BLT menus, the choice of combinations of featured dishes that mimic those offered by plaintiff's eateries and a mimicking of plaintiff's pricing. (*Id.* ¶¶ 40–45).

Based on these allegations, plaintiff asserted, as its first cause of action, a breach-of-contract claim against Tourondel, alleging that he had violated the contractual ban on his use of "proprietary and confidential" information belonging to plaintiff. (*Id.* ¶¶ 73–77; *see also id.* ¶¶ 25–33).[1] Plaintiff next invoked its one federal-law claim, asserted against all three defendants, contending that they have engaged in "unfair competition" under the Lanham Act, 15 U.S.C. § 1125, by virtue of their alleged use of aspects of the BLT menu—misconduct that is described as including false designation of origin, false representations, misappropriation of property rights and good will and the false suggestion that plaintiff was affiliated with defendants' restaurants. (*Id.* ¶¶ 79–86). Plaintiff's third claim, asserted against all defendants, was based on the same conduct and alleged "deceptive acts and practices", in violation of N.Y. Gen. Bus. Law § 349. (*Id.* ¶¶ 88–91).

The fourth and fifth claims, both targeting Tourondel, sought declaratory judgments. The fourth asked for a declaration that under plaintiff's contract with Tourondel, he was prohibited from using plaintiff's "proprietary and confidential information, including but not limited to its recipes, menus and marketing materials" at his own restaurants. (*Id.* ¶¶ 93–97). The fifth claim asserted that Tourondel had fraudulently induced plaintiff into amending the original contract so that, if Tourondel left to go into business on his own, he could use the trade name BLT but plaintiff could not do so in connection with any new restaurants. On the basis of that claimed fraud, plaintiff asked for a reformation of the amended contract to allow it to use the BLT trade name in connection with all of its restaurants, old and new. (*Id.* ¶¶ 99–108; *see also id.* ¶¶ 18–24).

Plaintiff's sixth claim was for unjust enrichment. The stated basis for this claim was its contention, once again, that Tourondel had tricked plaintiff into giving up its right to use the BLT trade name on new restaurants. As a result, it contended, Tourondel has been unjustly enriched. (*Id.* ¶¶ 110–14).

Plaintiff's seventh claim was for breach of fiduciary duty by Tourondel. The complaint noted that under plaintiff's contract, it retained the services of Tourondel as a consultant, and it claimed that Tourondel has breached his obligations in that respect by engaging with another financier, through the entity BLT Burger Ltd., to open a restaurant in Hong Kong, a transaction that plaintiff alleges has deprived it of a profitable business opportunity in that location. (*Id.* ¶¶ 116–18; *see also id.* ¶¶ 61–71).

---

1.  We describe the claims as articulated in the current pleading, which is the Amended Complaint. As discussed below, plaintiff has moved for leave to file a somewhat altered pleading, denominated as the Second Amended Complaint. (*See* pp. 15–17, *infra* ).

Plaintiff's eighth labeled claim amounted to a demand for attorney's fees and costs. Plaintiff premised this request on a provision of the contract between it and Tourondel under which any breach of the agreement that triggered a need for attorneys would justify an award of such fees and costs to the prevailing party. (*Id.* ¶¶ 120–22).

Following the filing of plaintiff's amended complaint and a responsive pleading by defendants, defendants moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). By memorandum and order filed July 19, 2011, the District Court granted the motion with respect to the General Business Law, contract-reformation and unjust-enrichment claims and otherwise denied defendants' application. *BLT Rest. Grp. LLC v. Tourondel,* 2011 WL 3251536, *4–7 (S.D.N.Y. July 19, 2011).

The parties have pursued written discovery, including principally the exchange of documents. While still engaged in that process, however, they filed the three motions now before us. We address these motions *seriatim.*

## ANALYSIS

### I. *Supplemental Jurisdiction*

Defendants have moved to dismiss portions of plaintiff's remaining state-law claims for lack of subject-matter jurisdiction. The premise for their motion is that plaintiff cannot satisfy the statutory requirements for the court's assertion of supplemental jurisdiction with respect to any of their state-law claims except insofar as the complaint asserts that defendants'

menu violates plaintiff's rights either under the contract or under other state-law theories. (Defs.' Juris. Mem. of Law at 3–9; Defs.' Juris. Reply Mem. of Law at 1–9). We disagree, and hence deny this motion.[2]

The Supreme Court long ago addressed the permissible scope of what it then termed pendent federal-court jurisdiction over state-law claims. In *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), it held that such jurisdiction may be asserted if the state and federal claims share a "common nucleus of operative fact". *Id.* at 725, 86 S.Ct. 1130; *accord Lyndonville Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 704 (2d Cir.2000). This principle was later adapted and incorporated into the United States Code under the rubric of supplemental jurisdiction. The pertinent provision states:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). The statute goes on to provide that even if the state-law claims meet the Article III "case or controversy" test, the district court may, in its discretion, decline to assert jurisdiction over them in four circumstances:

> if—

---

**2.** Because defendants filed their dismissal motion prior to the issuance of Judge Daniels's decision, which granted in part their motion for judgment on the pleadings, they seek partial or complete dismissal of the three claims that he has since dismissed in their

entirety. Since he dismissed those claims—for deceptive acts and practices under the General Business Law, for contract reformation and for unjust enrichment—we do not address them in the current context.

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

■■■ The focus of defendants' argument is on plaintiff's asserted failure to meet the initial, mandatory "case or controversy" requirement of section 1367(a). (Defs.' Juris. Mem. of Law at 4–9).[3] To satisfy that test, the federal and state claims must, as under *United Mine Workers*, "stem from the same 'common nucleus of operative fact.'" *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 332 (2d Cir.2011) (quoting *United Mine Workers*, 383 U.S. at 725, 86 S.Ct. 1130). What that term means more precisely is subject to some question, but our circuit court has recognized that this standard does not require that the elements of the state-law claims must turn on precisely the same historical events as the federal claims. Rather, a sufficient relationship will be found if the facts pertinent to the federal and state claims substantially overlap or if "presentation of the federal claim necessarily [would bring] the facts underlying the state claim before the court." *Lyndonville Sav. Bank*, 211 F.3d at 704 (citing *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 254 (2d Cir.1991); *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 445–48 (2d Cir.1998)). Thus, as noted in *Montefiore*, the two sets of claims "must be such that the plaintiff 'would ordinarily be expected to try them all in one judicial proceeding.'" 642 F.3d at 332 (quoting *United Mine Workers*, 383 U.S. at 725, 86 S.Ct. 1130). *See, e.g., Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir.2004) (upholding supplemental jurisdiction over fiduciary-breach claims against some defendants based on copyright claims against other defendants because all claims arose from sale of copyrighted film); *accord, e.g., Brunswick Surgical Ctr., LLC v. CIGNA Healthcare*, 2010 WL 3283541, *1 (D.N.J. Aug. 18, 2010) (finding supplemental jurisdiction over health-care providers' state-law claims for insurance reimbursement under non-ERISA policies based on federal jurisdiction over ERISA claims for reimbursement under other policies) (cited with approval in *Montefiore*, 642 F.3d at 332–33).[4]

---

**3.** There is no question that subsection 1367(b) and other jurisdictional sections of the Code do not apply here. Hence the only questions that we address concern the requirements of sections 1367(a) and (c).

**4.** The Second Circuit has regularly invoked language from the pre-statutory *United Mine Workers* decision, implying that the statutory standards governing the required relationship between federal and state claims are at least similar, if not identical, to those articulated by the High Court in its definition of the limits of pendent jurisdiction. *E.g., Achtman v. Kirby McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir.2006). We note that at least one circuit has indicated that it reads section 1367 as requiring only "[a] loose factual connection between the claims", *see Channell v. Citicorp Nat'l Servs.*, 89 F.3d 379, 385 (7th Cir. 1996) (quoting *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir.1995)), but the Second Circuit has not explicitly decided whether this characterization is justified, although at least one of its decisions might be read as implicitly endorsing it. *See Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 212–14 (2d Cir.2004) (finding satisfaction of section 1367(a) requirements for jurisdiction over permissive counterclaims for amounts due on outstanding loans when plaintiffs' federal claims alleged discriminatory loan terms; court relies

In this case we look in the first instance to what evidence is likely to be offered with regard to the federal and state claims. As defendants note, the only federal claim is for unfair competition with regard to the menus used by the adversarial parties, and defendants go on to assert that consequently the federal claim could be adjudicated based solely on what information is found in the dueling menus. Accordingly, they say, all of the state-law claims, insofar as they address non-menu issues—such as the alleged use of plaintiff's recipes and the asserted imitation of plaintiff's marketing techniques (notably the use of promotional magazines)—will rely on evidence that is not necessary to address the one federal claim. (Defs.' Juris. Mem. of Law at 4–9).

This approach misconceives the nature of the pertinent analysis, which does not depend upon a diagrammatic abstracting of the bare elements of the federal claim in order to define the minimum theoretically necessary evidence to prove or disprove the claim. Rather, the court should look to whether the evidence likely to be used in the specific case in addressing the federal claim is likely to substantially overlap that used to address the state-law claims. *See, e.g., Achtman*, 464 F.3d at 336; *Lyndonville Sav. Bank*, 211 F.3d at 700; *Chaluisan v. Simsmetal E. LLC*, 698 F.Supp.2d 397, 401–06 (S.D.N.Y.2010) (analyzing evidence common both to plaintiff's Fair Labor Standards Act claim and state-law claims). Indeed, it is only by such an assessment that one can fairly determine whether a plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *Lyndonville Sav. Bank*, 211

F.3d at 704 (quoting *United Mine Workers*, 383 U.S. at 725, 86 S.Ct. 1130).

■ In this case, all of the claims arise from, and will invite substantial proof concerning, two broad areas of historical fact—the parties' initial conjoining of their efforts to create a series of particularly styled restaurants and then Tourondel's departure and alleged use of his knowledge of the BLT business operation-including menus, recipes and promotional activities—to compete with, and supposedly injure, plaintiff's business. It is self-evident that even for the narrower federal claim, which targets the menus, the evidence that will be offered will touch on food choices for both sides' restaurants, terminology used in the menus as part of a broader effort to create a particular image in the mind of the public, pricing structure and even the use of similar or identical recipes, aspects of which appear in the menus in question. (*See* Am. Compl. Exs. A–D). Moreover, it is to be expected that the entire context of the parties' original relationship and the events leading to, and following, the breach would be offered in evidence even if the federal claim were the only one being litigated here. Indeed, to the extent that that claim is premised on the purported use by defendants of plaintiff's "proprietary materials" or "confidential information", the evidence of the parties' pre-separation dealings may be essential to discerning the meaning and scope of those terms and what information was in fact confidential or proprietary to plaintiff. Under these circumstances, it cannot be seriously questioned (1) that there will be

on the fact that all claims arose from plaintiffs' decisions to buy Ford cars even though the federal and state claims were based on two different sets of events-the signing of the loan agreement and the later failure to pay what was owed). Given some doubt as to the

viability of the "loose factual connection" standard in this circuit, we do not rely on it here. *But see In re Sept. 11th Liab. Ins. Coverage Cases,* 333 F.Supp.2d 111, 116 (S.D.N.Y.2004) (endorsing "loose factual connection" standard).

substantial overlap of facts and evidence presented on the federal and state claims and (2) that in this context plaintiff would surely be expected to litigate these claims in one suit.

In resisting this conclusion, defendants heavily rely on *Lyndonville* (*see* Defs.' Juris. Mem. of Law at 1–3; Defs.' Juris. Reply Mem. of Law at 1–5), but that reliance is misplaced. It was conceded there that the federal claim at issue was a very narrow one—whether the plaintiff bank was entitled to a civil judgment requiring the defendant to pay a previously entered criminal restitution order—and the bank's attorney conceded that he would not offer any evidence in support of the federal claim other than the restitution order itself. 211 F.3d at 705. Necessarily, then, as the Second Circuit noted, "the bank implicitly admitted that there was no need to introduce any evidence of the Gray loan [for which the bank pressed state-law claims] to support the restitution claim. In Lyndonville's words, the restitution count was 'just law,' with the existence of a prior valid order as the *only* operative fact." *Id.* (emphasis in original). Of particular note, the Court in *Lyndonville* cited that concession as central to its holding, as well as the fact that the Gray loan was irrelevant to the restitution order, and in doing so, the Court distinguished a prior circuit decision, invoked by the bank, that strongly supports the conclusion that we reach here. *Id.* at 704–05 (discussing *Rosario v. Amalgamated Ladies' Garment Cutters' Union*, 605 F.2d 1228 (2d Cir. 1979)).

In *Rosario*, the plaintiffs had gotten into an altercation with a union official and as a result were forced into union disciplinary proceedings. They sued, asserting federal claims arising from the disciplinary process and state-law claims for the preceding altercation. The circuit court upheld supplemental jurisdiction despite the fact that the state-law claims focused solely on the events that occurred before the disciplinary proceedings were commenced. In doing so, it noted that the confrontation was "unquestionably relevant" to the disciplinary proceeding (and hence to the federal claim) and that the conduct of the union manager at the hearing "bore on issues common to both claims." *Lyndonville*, 211 F.3d at 705 (quoting *Rosario*, 605 F.2d at 1247).

Similar to the circumstances found in *Rosario*, in this case the history of the relationship and dealings of the parties before Tourondel's departure and the full scope of defendant's operation of his new restaurants after his departure from BLT will be relevant to—even if not dispositive of—plaintiff's federal unfair-competition claim, and that same history will be pertinent to the various state-law claims that plaintiff presses. In short, plaintiff satisfies the Article III test embodied in section 1367(a).

There remains the question of whether the court should decline to assert otherwise available supplemental jurisdiction based on any of the statutory exceptions listed in section 1367(c). Defendants do not argue that any of these exceptions apply here, and we see no basis for invoking any of them.

Plaintiff's state-law claims do not present "a novel or complex issue of State law", but rather a garden-variety question of contractual interpretation. Those claims also do not "substantially predominate" over the federal claim, except in numerosity, and that does not provide a basis for invoking this exception. *See, e.g., Akwesi v. Uptown Lube & C/W, Inc.*, 2007 WL 4326732, *5 (S.D.N.Y. Dec. 3, 2007) (noting, in context of § 1367(c), that "[i]t is not enough to point out that plaintiffs bring numerically more state law claims

than federal claims"). As we have noted, the evidence pertinent to the federal claim is likely to overlap substantially with the evidence relevant to the state-law claims, and hence the joint adjudication of these claims will promote judicial and cost efficiency. As for the remaining statutory considerations, the federal claim remains in the case, and we are aware of no other "compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(4). Finally, we observe that even if one of these exceptions might potentially apply, we may still not dismiss unless we also find that dismissal would serve the interests cited in *United Mine Workers,* which include "economy, convenience, fairness and comity." *Jones,* 358 F.3d at 214 (citing *Itar-Tass Russian News Agency,* 140 F.3d at 445–47). For reasons already noted, dismissal would disserve these interests rather than promote them.

In sum, we deny defendants' motion for partial dismissal based on lack of subject-matter jurisdiction.

## II. *Plaintiff's Motion to Amend*

Plaintiff has moved for leave to amend its most recent amended complaint in the form of a proposed Second Amended Complaint. The motion postdated Judge Daniels's dismissal of a portion of the current pleading, and the requested amendments would add factual averments and incorporate new claims under the rubric of the first, second, third and seventh causes of action. It would also substitute Think Burger, LLC as a defendant in place of LT Burger, Inc., which Think Burger owns. (Decl. of Julian Schreibman, Esq. ¶ 4). Defendants consent to the substitution, but oppose the balance of the motion. (*Id.;* Defs.' R.15 Mem. of Law at 1). Before considering the merits of plaintiff's motion, we briefly reiterate the oft-cited

standards for assessing Rule 15 applications.

### A. *Rule 15(a) Standards*

Where, as here, a plaintiff may no longer amend the complaint as a matter of right, Rule 15(a) of the Federal Rules of Civil Procedure specifies that courts should "freely give" leave to amend "when justice so requires." As explained by the Supreme Court, such leave is to be liberally granted:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, "be freely given."

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *accord, e.g., United States ex rel. Mar. Admin. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago,* 889 F.2d 1248, 1254 (2d Cir.1989).

■■ As *Foman* suggests, one circumstance that justifies denial of a motion for leave to amend is a determination that the proposed amendment would be futile. *See, e.g., Tocker v. Philip Morris Cos.,* 470 F.3d 481, 491 (2d Cir.2006); *Marchi v. Board of Coop. Educ. Servs.,* 173 F.3d 469, 477–78 (2d Cir.1999). Futility may be shown by demonstrating that the proposed new pleading fails to state a cognizable claim and thus would be subject to dismissal under Rule 12(b)(6), *see, e.g., Nettis v. Levitt,* 241 F.3d 186, 193, 194 n. 4 (2d Cir. 2001) (*per curiam* ), or is otherwise facially

inadequate. *See, e.g., Sookoo v. Heath,* 2011 WL 6188729, \*3 (S.D.N.Y. Dec. 12, 2011) ("When the claims that a petitioner seeks to add to a habeas petition are untimely ... the amendment is futile, and leave to amend should be denied.").

■ As an alternative ground, a court may deny a requested amendment if it would unduly prejudice the other side or seriously interfere with the court's efforts to ensure the efficient and reasonably prompt conclusion of pretrial proceedings. *See, e.g., MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.,* 157 F.3d 956, 962 (2d Cir.1998) (*per curiam*); *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir. 1990). Delay alone is generally not a sufficient basis for denying relief, *e.g., Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir.2008); *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d cir.1993), but if that delay is particularly egregious or prejudicial, or the complications that it would impose on pretrial scheduling are sufficiently compelling, the court may decline the request for an amendment. *See, e.g., Littlejohn v. Artuz,* 271 F.3d 360, 363 (2d Cir.2001) (*per curiam*); *MacDraw, Inc.,* 157 F.3d at 962.

Citing two grounds, defendants oppose the proposed amended version of the four contract-breach claims as futile. First, they assert that the claims are barred for lack of subject-matter jurisdiction. (Defs.' R.15. Mem. of Law at 11–14). Second, they argue that a number of the newly configured allegations fail to state any cognizable claim. (*Id.* at 14–18). Moreover, in a preliminary section of their memorandum of law they seem to suggest that discovery has turned up evidence that undercuts some, if not all, of the claims. (*Id.* at 6–10). Alternatively, defendants assert in fairly skeletal terms that granting the motion would cause them undue prejudice. (*Id.* at 18–20).

### B. *Futility*

Defendants first argue that the proposed amendments to add claims or portions of claims would be futile because of the previously discussed asserted lack of subject-matter jurisdiction. Since we have already rejected that argument in the context of defendants' motion to dismiss, and because they have not suggested that the proposed new claims differ from the challenged preexisting ones on any basis pertinent to the jurisdictional question, we reject defendants' argument for reasons already discussed.

Alternatively, defendants argue that some of the proposed new claims are futile because they fail to state a cognizable claim. This argument requires an examination of the proposed amendments through the prism that would apply to a Rule 12(b)(6) motion. *E.g., Nettis,* 241 F.3d at 193, 194 n. 4.

### 1. *Rule 12(b)(6) Criteria*

The traditional test on a Rule 12(b)(6) motion allowed the complaint to survive unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Leibowitz v. Cornell Univ.,* 445 F.3d 586, 590 (2d Cir.2006) (*per curiam*) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Supreme Court has since rejected this formulation, however, and hence, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (internal quotation marks omitted). Under this "plausibility standard," our analysis re-

quires two steps. "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions[,] and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Iqbal,* 129 S.Ct. at 1949) (internal quotation marks omitted). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* (quoting *Iqbal,* 129 S.Ct. at 1950).

We are obligated to "accept all factual allegations in the complaint as true and draw all reasonable inferences in [plaintiff's] favor." *Hayden v. Paterson,* 594 F.3d 150, 160 (2d Cir.2010) (quoting *Johnson v. Rowley,* 569 F.3d 40, 43–44 (2d Cir.2009)) (brackets in original). However, we are "not required to draw unreasonable inferences or to credit legal conclusions at odds with plaintiff's own factual allegations." *Solow v. Stone,* 994 F.Supp. 173, 181 (S.D.N.Y.1998) (citing *De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996)). And "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief.'" *Iqbal,* 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)). In short, the pleading must do more than "tender[ ] naked assertions devoid of further factual enhancement", *id.* at 1949 (internal quotation marks omitted), and in doing so it must " 'raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955).

■ When assessing a Rule 12(b)(6) motion, the court may not consider evidence proffered by the parties. Rather, it is limited to reviewing the four corners of the complaint, any documents attached to that pleading or incorporated into it by reference, any documents that are "integral" to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice. *See, e.g., ATSI Commc'ns, Inc.,* 493 F.3d at 98; *Leonard F. v. Israel Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991).

### 2. *The Proposed Second Amended Complaint*

■ In plaintiff's proposed Second Amended Complaint we find some alterations from its predecessor in the order of the narrative and in rhetoric used to describe defendants' alleged misdeeds. (*Compare, e.g.,* 2d Am. Compl. ¶ 16 (explaining the parties' separation by describing Tourondel as "greedy for even more money"), *with* Am. Compl. ¶ 38 (explaining separation by alleging that "Tourondel was increasingly at odds with the other members of BLT Restaurant")). As for the factual allegations, apart from asserting in substance, as before, that Tourondel misappropriated proprietary and/or confidential information in the form of recipes, as well as combinations, names, and descriptions of dishes and pricing in the menus, and the use of a marketing magazine (*see, e.g.,* 2d Am. Compl. ¶¶ 39–49, 61–66, 79–84), plaintiff alludes to the copying of "preparation techniques" and "presentation style" (*id.* ¶ 17), and adds allegations to the effect that Tourondel improperly lured away from plaintiff "his personal assistant". (*Id.*). Plaintiff also asserts that he refused to return, and then destroyed, "confidential and proprietary information" when he held on to a plaintiff-supplied laptop and then returned it only after erasing its hard drive. (*Id.* ¶¶ 17, 74–76).

As for the claims asserted in this newest version of the complaint, plaintiff pleads a somewhat updated version of its contract-breach theory, now encompassed in four separate claims, all asserted only against Tourondel. For the first claim, apart from the general mention of asserted breaches of the contractual bar on misappropriation of confidential and proprietary information, plaintiff refers to the opening of a steak restaurant by defendants in the Manrey Hotel in Panama, and it alleges that Tourondel copied dishes and forms of presentation as well as decor from the BLT steak restaurants. (*Id.* ¶¶ 33–51).

Plaintiff's second contract claim focuses on a burger restaurant opened by defendants in Sag Harbor. It alleges that, at this location, Tourondel copied BLT's combination of offered dishes, the names of the dishes, and the ingredients of the dishes. (*Id.* ¶¶ 53, 60–66, 68). As part of the same claim, plaintiff alleges similar misconduct in Tourondel's opening of a burger restaurant in the Manrey Hotel in Panama. (*Id.* ¶¶ 67–68).

The third proposed contract claim concerns Tourondel's temporary retention of a laptop computer received from BLT. According to the pleading, he was required to return all confidential and proprietary information upon his departure from the company, but refused to return the computer although it contained such information. Plaintiff goes on to say that Tourondel only surrendered the laptop, without the data—which he reportedly erased—after commencement of this lawsuit. (*Id.* ¶¶ 71–77).

Plaintiff's fourth claim, again for contract breach, complains about Tourondel's use of an in-house magazine to promote his LT line of restaurants as well as another food establishment in which he had an interest. Plaintiff suggests that Tourondel was thereby copying one feature of plain-

tiff's own promotional strategy, and the complaint particularly highlights the fact that defendant sent copies of this magazine to plaintiff's own BLT restaurants even though the magazine was in effect seeking to divert business to defendants' competing food emporia. (*Id.* ¶¶ 79–83). It also complains that Tourondel's assistant somehow "deceived" the managers of the BLT restaurants into paying for the delivery of these magazines. (*Id.* ¶¶ 84–86).

Plaintiff's fifth claim, pressed against all three defendants, is largely a repeat of its prior federal claim for unfair competition based on the assertion that BLT's burger menu "is a distinctive and original combination of products that was developed as, and remains, a unique matrix of meal options associated specifically with the food and service quality and price points of BLT Burger." (*Id.* ¶ 88). Plaintiff therefore claims that its menu should be deemed a protected, if unregistered, trademark under 15 U.S.C. § 1125(a). Plaintiff goes on to allege that defendants' equivalent burger menu infringes that trademark. Plaintiff's theory appears to be that the LT burger menu so mimics plaintiff's version—at least in its substance (including food combinations, names and prices)—that it (1) creates a false impression in the public "that LT Burger is sponsored by, endorsed or somehow affiliated with the BLT restaurants," and (2) that the similarities of the menus and "likely" the recipes give rise to a false designation of origin in that "the consuming public . . . will reasonably assume that these products originate with the same source: BLT Burger's well-established quality kitchens." (*Id.* ¶¶ 91–92; *see id.* ¶¶ 93–95). Apart from the purported misappropriation of plaintiff's good will and the potential loss of BLT's customers who may be diverted by virtue of confusion, the complaint asserts that the dining experience at

the LT Burger restaurants is inferior and that therefore plaintiff will be injured by customers' disappointment in the performance of defendants' burger restaurants. (*Id.* ¶ 96).

Plaintiff's next claim embodies a repleading of the fiduciary-breach claim from the current complaint. This claim is based on the notion that Tourondel, as a consultant for BLT after his departure, owed a duty of loyalty to the company—in particular, with respect to a Hong Kong eating establishment known as BLT Burger HK, which was operated by BLT Burger (HK) Limited, a company controlled by Dining Concepts, under license from BLT. According to plaintiff, Tourondel breached that fiduciary duty in 2010 by encouraging Dining Concepts to open another BLT Burger, from which he, but not plaintiff, would be paid. (*Id.* ¶¶ 101–10). Plaintiff goes on to report that it warned Dining Concepts that it was contractually barred from excluding BLT, and that as a result Dining Concepts proposed that both BLT and Tourondel share in the business. According to plaintiff, it agreed to such an arrangement but Tourondel "petulantly" did not. (*Id.* ¶ 111). Plaintiff goes on to allege that as a result of Tourondel's refusal, the project never went forward and that BLT was thereby injured by the loss of a business opportunity. (*Id.* ¶¶ 112–14).

The penultimate proposed claim seeks a declaratory judgment to the effect that Tourondel may not use the "proprietary and confidential information" of BLT—including "recipes, preparation techniques, menus and marketing materials"—in opening or operating any restaurant. (*Id.* ¶ 124), The premise for this request is the allegedly stated intention, of Tourondel to open a restaurant "in the form of an American brasserie" in conjunction with the Cassa N.Y. Hotel and Residences sometime in 2011. (*Id.* ¶¶ 122–23),

The final claim in the proposed new complaint reiterates plaintiff's request for attorney's fees and costs against Tourondel. (*Id.* ¶¶ 126–28).

### 3. *Assessment of the Proposed Amendments*

Defendants' Rule 12(b)(6) arguments do not justify dismissal. We address each set of targeted claims in turn.

Defendants first focus on the contract-breach claims that are premised on defendants' alleged use of plaintiff's proprietary and confidential information, an argument that implicates at least the first, second and fourth claims. Defendants argue that the contractual provisions governing such information preclude plaintiff from succeeding on its claims that Tourondel breached their terms. In pursuing this argument, they refer to their parallel summary-judgment motion papers for what they claim is a proper interpretation of the pertinent contractual terms (Defs.' R.15 Mem. of Law at 15), and they assert that the provisions in question that prohibit use by Tourondel cover only trade secrets and intellectual property originally belonging to him. (*Id.*). As for possible trade secrets, they argue that "[a]lmost all of the items allegedly misappropriated by Mr. Tourondel are in the public domain" and hence not "Confidential Information". (*Id.*). As for possible other intellectual property, they first argue that its use cannot be a subject of a contract-breach claim, and they then assert that "no intellectual property right is asserted." (*Id.*).

At least with respect to the first and second claims—invoking the Panamanian and Sag Harbor restaurants—these arguments fail for several reasons. First, the contractual provisions in question—insofar as they may apply to the facts alleged—are not unambiguous on their

face[5], a point that defendants seem implicitly to concede in asserting that their proper interpretation may be discerned from the evidence that they proffer on their Rule 56 motion. For example, section 8.11 of the contract covers both "confidential information" and "proprietary material", with the latter term not clearly defined (at least to distinguish it from "confidential information") and thus subject to disputable interpretation.[6] In particular, although defendants' argument on this point appears to rest on the assumption that Tourondel may freely use "proprietary materials", the contract is at least ambiguous on that point. *See* pp. 27–28, *infra.* Hence, a Rule 12(b)(6) dismissal would be inappropriate insofar as it rests on defendants' reading of the agreement.[7] Second, defendants argue without explanation that even if Tourondel misappropriated "proprietary" information, plaintiff may not assert it as a contract-breach claim (Defs.' R.15 Mem. of Law at 15), an argument that defendants do not explain in their motion papers and that—for reasons discussed below in addressing defendants' summary-judgment motion—has no evident legal basis.

Third, we cannot determine from the face of the complaint that Tourondel did not appropriate "confidential information", as defined in the contract, when he created his menus and otherwise designed his restaurants. If he did, then we cannot say as a matter of law that he did not breach the pertinent contractual provisions. This too precludes dismissal on the face of the pleading.

■ Fourth, as was noted in the prior dismissal decision of Judge Daniels, even if the menu and the appearance of the food (its "presentation") or the decor of the restaurant could not be found-either separately or in combination-to constitute "proprietary" information, however that term is defined, plaintiff appears to allege in both the first and second claims that Tourondel misappropriated secret recipes, an assertion that even defendants appear to concede may form a cognizable claim. (Defs.' R.15 Mem. of Law at 15) (confidential information is, in substance, trade secrets and "[a]lmost all of the items allegedly misappropriated by Mr. Tourondel are in the public domain"). Based on the inclusion of this allegation about recipes, Judge Daniels denied defendants' original motion to dismiss the pertinent claim, *BLT*, 2011 WL 3251536, at *5, and that analysis would not change in the face of either plaintiff's proposed amended allegations or defendants' dismissal arguments. Although it might be argued that if plaintiff pleads both cognizable and non-cognizable contract breaches, the court may dismiss in part even if the allegations are joined together in one labeled claim, Judge Daniels declined to adopt that approach, and his ruling is law of the case here. *See Kirschner v. Bennett (In re Refco Secs. Litig.)*, 759 F.Supp.2d 301, 307 (S.D.N.Y. 2010) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent

---

5. Although the contract was not attached to the complaint or proffered by either side on the motion to amend, it is certainly integral to the complaint and a copy was attached as an exhibit to defendants' summary-judgment motion. (Benschar Decl. Ex. A). Hence we refer to its terms insofar as pertinent.

6. The contract refers to these two terms in the disjunctive. (*See* Benschar Decl. Ex. A

§ 8.11(a) (referring to "confidential or proprietary information" and defining "Confidential Information") & § 8.11(b) (referring to "Proprietary Materials")).

7. We undertake a more detailed analysis of the contractual terms when addressing defendants' summary-judgment motion. *See* pp. 21–28, *infra.*

stages in the same case.") (quoting *Liona Corp. v. PCH Assocs. (In re PCH Assocs.),* 949 F.2d 585, 592 (2d Cir.1991)). Since defendants have offered no basis to overturn it, we decline to do so.

As for the fourth claim, which involves the use of an in-house magazine, neither defendants nor plaintiff meaningfully address its viability. (*See* Defs.' R.15 Mem. of Law at 9–10).[8] For present purposes, we conclude that the ambiguity of the term "proprietary information", as used in the contract, would preclude a 12(b)(6) dismissal of this claim.

Defendants also target plaintiff's third contract claim, which pertains to Tourondel's asserted theft of a company laptop. Their sole argument is that plaintiff's allegation of "injury", a requisite for a breach claim, is too conclusory to be plausible. (Defs.' R.15 Mem. of Law at 16–17). We reject this contention. There is no requirement for detailed specificity of pleading of injury in a contract claim, and in any event the allegation that Tourondel deprived plaintiff of its laptop for a period of time is injury enough to satisfy whatever pleading requirement might be recognized.

Defendants go on to suggest that it is unlikely that the loss of the laptop and Tourondel's alleged later deletion from the hard drive of data belonging to BLT deprived plaintiff of needed confidential or proprietary information (Defs.' R.15 Mem.

of Law at 17–18), but that is a factual question that cannot be properly disposed of in the current procedural posture. Moreover, the loss of such information to plaintiff is not a *sine qua non* for a viable claim against defendants, whether sounding in contract or otherwise.[9]

Finally, insofar as defendants may be arguing that pre-trial discovery has disproved some or all of plaintiff's claims, new or old (*id.* at 6–10), that is a matter that should be addressed in the context of a summary-judgment motion, not in opposition to a motion to amend. In any event, we note that defendants' factual arguments are not accompanied by the proffer of any concrete evidence, and plainly their opposition here does not demonstrate an absence of material and triable issues. For that assessment, we will separately address defendants' Rule 56 motion below. *See* pp. 20–21, *infra.*

### C. *Undue Prejudice and Delay*

As for defendants' assertion of prejudice, we find it entirely unpersuasive. They first allude to the delay in completing discovery (Defs.' R.15 Mem. of Law at 18–19), but that delay is attributable in part to defendants' request—granted by the court—to pursue partial summary judgment in the midst of discovery and to stay deposition discovery during the pendency

---

8. Defendants refer to unspecified discovery for their assertions that someone other than plaintiff created the magazine, that the copyright is not owned by plaintiff, and that the idea was not original. (Defs.' R.15 Mem. of Law at 9–10). All of these assertions are matters of fact and are not to be decided by way of a Rule 12(b)(6) analysis.

9. We note also that the fact that plaintiff labels this claim as one for contract breach does not preclude our recognizing plaintiff's allegations as sounding in some other legal theory, including, for example, conversion.

*See, e.g., In re Alstom SA Secs. Litig.,* 454 F.Supp.2d 187, 214 (S.D.N.Y.2006) ("The Court is not constricted to consider only the labels or legal theories that Plaintiffs have put on a claim; what is important is the substance of the claim and what cognizable legal theory it actually states."); *Aquilone v. Republic Nat'l Bank of N.Y.,* 1998 WL 872425, *5 (S.D.N.Y. Dec. 15, 1998) ("[U]nder the liberal rules of federal pleading, the label of a claim is not dispositive.") (citing *Alexander v. Unification Church of Amer.,* 634 F.2d 673, 678 (2d Cir.1980)).

of their motion.[10] They then emphasize that one new set of allegations concerns the establishment of a restaurant in Panama, and they argue that allowing this claim to proceed will engender burdensome and costly overseas discovery. (*Id.* at 19 & n. 2). There is nothing in the record, however, to indicate that the discovery triggered by this set of allegations will be prolonged or expensive, and the court retains adequate means of ensuring that proceedings not be unduly extended.[11]

In sum, we grant plaintiff's motion to serve and file its second amended complaint.

### III. *Defendants' Summary–Judgment Motion*

Defendants have moved for partial summary judgment. They do so principally in a stated effort to seek clarification as to the extent of Tourondel's obligations under his contract with BLT insofar as it barred him from the use of "confidential" or "proprietary" information or materials belonging to plaintiff. More specifically, they seek summary judgment on plaintiff's breach-of-contract claims insofar as they are premised on defendants' asserted use of aspects of plaintiff's menu. They also seek summary judgment on plaintiff's Lanham Act claim, a claim that is premised solely on the use of portions of plaintiff's menu.[12]

Before addressing the merits of this motion, we summarize the standards generally applicable to Rule 56 motions.

### A. *Summary–Judgment Standards*

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Feingold v. New York,* 366 F.3d 138, 148 (2d Cir.2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact' is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Shade ex rel. Velez Shade v. Hous. Auth. of the City of New Haven,* 251 F.3d 307, 314 (2d Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986); *see, e.g., Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Howley v. Town of Stratford,* 217 F.3d 141, 150–51 (2d Cir.2000).

**10.** We granted these requests on the representation that clarifying the meaning of the contract, insofar as it may limit what businesses Tourondel can now pursue, would be cost-efficient and conducive to possible resolution of the case. (*See* Endorsed Order dated Aug. 23, 2011). Those concerns were persuasive, but that does not mean that granting these requests should then preclude plaintiff from fine-tuning its pleading in the interim.

**11.** At one point defendants offer an estimate that discovery will be prolonged by as much as a year. (*Id.* at 19). This assertion—which concerns the length of discovery and not the period during which their own motion pends—is ungrounded by any explanation and is plainly fanciful.

**12.** As noted, in view of our grant of leave to amend, we refer to these claims as pled in the Second Amended Complaint.

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c)(1); *see, e.g., Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir.2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy his initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. *See, e.g., Celotex,* 477 U.S. at 322–23, 325, 106 S.Ct. 2548; *PepsiCo, Inc. v. Coca–Cola Co.,* 315 F.3d 101, 105 (2d Cir.2002) (*per curiam*); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). If the movant fails to meet his initial burden, however, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Giannullo v. City of New York,* 322 F.3d 139, 140–41 (2d Cir. 2003). If the moving party carries his initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact on any such challenged element of its claim. *See, e.g., Beard v. Banks,* 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006); *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548; *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001) (*per curiam*). In doing so, the opposing party may not rest "upon the mere allegations or denials of [its] pleading," *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti,* 374 F.3d 56, 59–60 (2d Cir.2004), nor may it rely on merely conclusory factual allegations. *See, e.g., Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000). It must also "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 75 (2d Cir.2005). Rather, it must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. *See, e.g., Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 526 (2d Cir.1994).

### B. Assessment of the Motion

#### 1. The Menu Contract Claims [13]

We first address defendants' challenge to one aspect of BLT's contract claims, that based on its allegation that Tourondel breached a prohibition on the use of either confidential information or proprietary materials when he utilized menus that featured combinations of dishes similar to those found in plaintiff's burger (and possibly steak) restaurants, with similar or identical names and pricing. The nub of the dispute, as briefed by the parties, turns on the litigants' respective interpretations of section 8.11 of the contract. Thus, they have not sought to proffer evidence beyond the terms of that document and a few short snippets of largely irrelevant deposition testimony by a handful of

---

**13.** In view of our granting plaintiff's motion to amend, we treat defendants' Rule 56 motion as directed to the first and second claims in the Second Amended Complaint, which are essentially the same as a portion of plaintiff's single multipart contract claim in its predecessor pleading.

corporate representatives, and instead they rest their arguments on textual disagreements.

(a). *The Pertinent Contract Terms*

The contract at issue, labeled "Operating Agreement of BLT Management LLC", was an agreement between JL Holdings, James Haber, Laurent Tourondel and Keith Treyball, and defined the pertinent terms of their relationship in the operation of the BLT LLC. By its terms, BLT LLC was to engage in the ownership and management of restaurants. (Benschar Decl. Ex. A § 4.1). The agreement covered three identified New York City restaurants—referred to as BLT Steak, BLT Fish and BLT Meat—"and any other restaurant as determined by the managers." (*Id.* § 1.1 at p. 11 [BLT000013] ). The LLC had three members, JL Holdings, Tourondel and Treyball, who held interests of 37.5%, 47.5% and 15%, respectively. (*Id.* "Exhibit A" [BLT000058] ).[14]

The agreement stated that Haber and Tourondel were appointed as Managers of the LLC and were thereby charged with the responsibility to run the business of BLT. (*Id.* §§ 7.1, 7.4). The managers assumed fiduciary responsibilities for the operation of the LLC (*id.* § 7.7(a)) but were not compensated for these services other than as specified in the agreement, which provided for Tourondel to receive an annual salary in his capacity as an Employee Member of the LLC and allowed him to receive some outside income from one identified non-LLC restaurant. (*Id.* §§ 7.6, 8.2, 8.4).

Both Tourondel and Treyball were identified as Employee Members of the LLC.

(*Id.* § 8.1). In that capacity Tourondel was to serve as "Executive Chef" at all of the LLC restaurants. This meant that he was responsible for " 'back of the house' activities", whereas Treyball was responsible for "all 'front of the house' activities". (*Id.* §§ 8.2, 8.3). The agreement further specified that Tourondel and Haber were to be jointly responsible for "[a]ll decisions relating [to] the decor, menu, and publicity and day-to-day management of the Restaurant [s], including, but not limited to, the hiring or termination of any and all Restaurant personnel and all decisions relating to the concept, design and location of any future restaurants." (*Id.* § 8.2). As an Employee Member, Tourondel was prevented, except as otherwise specified, from owning, managing or being involved in any other restaurant business during his tenure with BLT, as well as from interfering with the business of BLT for the benefit of another company. (*Id.* § 8.10).[15]

The language central to the current dispute is found in section 8.11, which is titled "Confidentiality/Proprietary Rights/Return of Company Property". As the title suggests, this set of provisions specifies, and provides an extremely long and broad list of examples of, two possibly overlapping categories of information, one referred to as "Confidential Information" and the other identified as "Proprietary Materials". It then defines the obligations of the Employee Members with respect to each category.

Section 8.11(a) refers to both categories but then addresses directly "Confidential Information." Thus it specifies the following:

14. The contract also listed "Non–NYC percentage interest[s]"—referring to the profits of BLT restaurants outside New York City—which were allocated 50% to JL Holdings and 50% to Tourondel. (*Id.; see also id.* § 6.5(a)).

15. Tourondel was permitted to have a passive ownership interest of not more than 5% in other restaurant companies. (*Id.* § 8.10(a)(i)).

Each Employee Member ... has and will have access to and participate in the development of or be acquainted with confidential or proprietary information and trade secrets related to the business of the Company ..., including but not limited to (i) business plans, operating plans, marketing plans, bid strategies, bid proposals, financial reports, operating data, budgets, wage and salary rates, pricing strategies and information, terms of agreements with suppliers or customers and others, customer lists, formulas, patents, devices, software programs, reports, correspondence, tapes, discs, tangible property and specifications owned by or used in the Companies['] businesses, operating strengths and weaknesses of the Companies' Members, shareholders, officers, directors, employees, agents, suppliers and customers, and/or (ii) information pertaining to future developments such as, but not limited to, research and development, future marketing, distribution, delivery or merchandising plans or ideas, and potential new distribution or business locations, and (iii) other tangible and intangible property, which is used in the business and operations of the Companies, but not made publicly available (the *"Confidential Information"*).

(*Id.* § 8.11(a)) (emphasis in original).

Unlike this provision, the next subsection, 8.11(b), has a title, "Proprietary Rights", and it focuses on a somewhat narrower subset of information. Thus it states in its first sub-paragraph that the Employee Members each agree that they have "no rights in, or claims with respect to, any inventions, original works of authorship, developments, improvements, or trade secrets which were made by the [Employee Members] prior to the date hereof and which relate to the business, products or services of the Company (a

*"Prior Invention"*)." It goes on to provide that if the Employee Member, during his tenure, "incorporates into a product, process, device or system a Prior Invention owned by him or in which [he] has an interest", BLT will have "a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license" to use and sell that "Prior Invention as part of or in connection with such product, process[,] device or system." (*Id.* § 8.11(b)(i)).

As for products or ideas developed by the Employee Member during his tenure—defined as "Proprietary Materials"— the next sub-paragraph specifies the following:

All discoveries made, inventions created, and all ideas, concepts, designs, formulas, proposals, projects, programs, products, processes, systems, techniques, and improvements of whatever kind related to the Company's business, products or research and development, whether or not patentable or registrable under copyright or similar laws, conceived or developed by the [Employee Manager] directly or indirectly, alone or jointly with others, in each case, in the course of holding Membership Interests of the Company (*"Proprietary Materials"*), shall be and remain the sole and exclusive property of the Company.... [T]he [Employee Member] hereby assigns to the Company all of [that person's] right, title and interest in and to any such Proprietary Materials. The [Employee Member] further acknowledges and agrees that all original works of authorship which are made by him (solely or jointly with others) within the scope and during the period of his holding Membership Interests of the Company and which are protectible by copyright are "works made for hire," as that term is defined in the U.S. Copyright Act.

(*Id.* § 8.11(b)(ii)) (emphasis in original). The following subparagraph requires the Employee Member to cooperate with the Company "to perfect, secure, and maintain all right, title, and interest in and to any Proprietary Materials, including, without limitation, any and all patent, copyright, trademark: and trade secrets rights and protections...." (*Id.* § 8.11(b)(iii)).

Consistent with these requirements, the last subparagraph of subsection 8.11(b) requires that, at the time that the Employee Member leaves the LLC, he must

> deliver to the Company (and shall not keep in his possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed or received by him in the course of his holding Membership Interests of the Company or otherwise belonging to the Company ....

(*Id.* § 8.11(b)(iv)). Similarly, he is required, upon departure, to return all "Company Property", which includes "without limitation, all Confidential Information, documents, correspondence, notebooks, reports, computer programs, names of full-time and part-time employees and consultants, and all other materials and copies thereof ... relating in any way to the business of the Company in any way obtained by [him] during the period of his Position with the Company." (*Id.* § 8.11(e)).

Subsection 8.11(c) is of equal pertinence to the current dispute. It states that "[t]he [Employee Member] shall not, directly or indirectly, disclose, use or make known for his or another's benefit any Confidential Information of the Companies or use such Confidential Information in

any way except in the best interests of the Companies in the performance of [his] duties under this Agreement." (*Id.* § 8.11(c)). Moreover, these obligations are stated to survive the Employee Member's departure from the LLC. (*Id.* § 8.11(d)).

Finally, we note that the agreement makes specific provision for the transfer by plaintiff to Tourondel of the trademarks BLT and BISTRO LAURENT TOURONDEL upon his departure from the LLC. (*Id.* § 8.12). By amendment to the contract, the contracting parties also agreed that if Tourondel departed, BLT would be licensed to use these trademarks only in connection with its pre-existing restaurants and any then in the process of construction. (*Id.* "Amendment 2" at p. 6 [BLT000067] (amending § 8.12)). In addition, the parties agreed that in the event of Tourondel's departure from membership in the LLC, he would still provide compensated consulting services to BLT in connection with restaurant-management agreements that the LLC may have entered into with third parties. (*Id.* "Amendment 2" at pp. 2–6 [BLT000063–67] (amending § 8.7)).

### (b). *The Import of These Provisions*

In substance, defendants argue that Tourondel cannot be deemed to have breached the contract by virtue of his use of a menu that contains some textual resemblance to the menus utilized by plaintiff. According to defendants, this follows from their interpretation of section 8.11, which, they say, separately defines "Confidential Information" and "Proprietary Materials". They assert that the BLT menus cannot be confidential information since they are publicly available, and that the only provision that precludes Tourondel from using information gleaned from his work at BLT is section 8.11(c), which pro-

hibits only his use of confidential information. In contrast, they say, the provisions governing proprietary information—addressed in section 8.11(b)—contain no such restriction on use and merely provide that such materials are the property of BLT. Defendants go on to suggest that the only function of ensuring that these materials belong to plaintiff is to permit BLT to assert, if it can, a claim of entitlement under the copyright, trademark, patent or other laws governing intellectual property. (Defs.' R. 56 Mem. of Law at 3–11; Defs.' R.56 Reply Mem. of Law at 4–11). In short, they say that plaintiff's ownership of these materials does not give it a contractual right to bar Tourondel from using them.[16] In support of this conclusion, they further suggest that public policy disfavors the notion that Tourondel may be prohibited from utilizing publicly available information absent the applicability of copyright, trademark or patent protection. (Defs.' R.56 Mem. of Law at 7–8).

Plaintiff offers what appears to be a two-prong argument in response. First, it contends that section 8.11(a), insofar as it addresses the notion of confidential information, is not limited to non-public information. In making that argument, BLT observes that the cited provision lists three categories of materials—separately described in items (i), (ii) and (iii)—and that only the description of item (iii), which covers "other tangible and intangible property", says that this information must "not [have been] made publicly available". (Pl.'s R.56 Mem. of Law at 10–11). Plaintiff infers, therefore, that materials that come within the very broadly defined items (i) and (ii) may qualify for protection even if they have been publicly disclosed, and it seems to say that the menus fit

within item (i), which includes references to "pricing strategy and information" and marketing. (*Id.* at 10–12). Hence plaintiff says that section 8.11(a) precludes Tourondel's copying of the BLT menus with regard to combinations of foods, the naming of individual dishes, and pricing. (*Id.*).

In explaining this point and responding to defendants' policy argument, plaintiff asserts that Tourondel agreed by contract to limit his ability to utilize even public information and should be held to this agreement. (*Id.* at 11–12) In effect, then, plaintiff would have us treat the cited provision as a limited non-compete agreement.

When assessing these arguments, we start with certain basic principles of New York law, which governs the interpretation of this contract. (Benschar Decl. Ex. A § 19.18). As a general matter, contract claims may not be disposed of by summary judgment "if the resolution of a dispute turns on the meaning of an ambiguous term or phrase." *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir.2011) (citing *inter alia State v. Home Indem. Co.*, 66 N.Y.2d 669, 671–72, 495 N.Y.S.2d 969, 971, 486 N.E.2d 827 (1985)). Ambiguity is to be found if the language used is susceptible to at least two reasonable interpretations. *E.g., Home Indem.*, 66 N.Y.2d at 671, 495 N.Y.S.2d at 971, 486 N.E.2d 827. That said, summary judgment may be appropriate even if the contractual language is ambiguous, provided that the available parol evidence unambiguously demonstrates its meaning. *E.g., Fed. Ins.*, 639 F.3d at 567 (quoting *Compagnie Financiere de CIC v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir.2000)).

---

**16.** Defendants go on to argue, in the second point of their motion papers, that the cited intellectual-property principles do not protect

BLT's menus from imitation. (Defs.' R.56 Mem. of Law at 11–18; Defs.' R.56 Reply Mem. of Law at 12–16).

■ In this case the parties dispute whether the term "confidential information" may include material that has been made public. Plaintiff's assertion to this effect is indefensible in light of the clarity and well-accepted meaning of the term. "Confidential" is a word denoting secrecy, the very antithesis of public disclosure. *E.g.*, Confidential Definition, *Merriam-Webster.com*, http://www.merriam-webster.com/dictionary/confidential (last visited Feb. 15, 2012) [17]; Confidential Definition, *Oxford Dictionaries.com*, http://oxforddictionaries.com/definition/confidential (last visited Feb. 15, 2012) [18]; Confidential Definition, *Cambridge Dictionaries Online*, http.//dictionary.cambridge.org/dictionary/british/confidential (last visited Feb. 15, 2012) [19]; Confidential Definition, *Langman Dictionary of Contemporary English*, http.//www.Idoceonline.com/dictionary/confidential (last visited Feb. 15, 2012).[20] In addition, we note that the specific examples of "Confidential Information" provided in subsections 8.11(a)(i) and (ii) are entirely consistent with this common understanding of the term "confidential". All embody types of documents or information that are typically held close in a business and not normally disclosed to outsiders. *See, e.g., Mitchell v. Metro. Life Ins. Co.*, 2004 WL 2439704, *2 (S.D.N.Y. Nov. 2, 2004) (holding that documents containing "internal financial analyses, business plans and other sensitive company information" were confidential and "entitled to protect[ion] from competitors' view"); *see also Brookdale Univ. Hosp. & Med. Ctr.*, 2008 WL 4541014, *1–2

(E.D.N.Y. Oct. 7, 2008) (upholding confidentiality designations of documents that included "financial data, marketing and advertising data and plans, strategic or long-range plans, internal cost data, performance data, customer or vendor data [and] contracts and agreements with third parties").

In seeking to avoid the import of this facially unambiguous term, plaintiff points to other wording in the pertinent provision of the contract that it says casts doubt on the otherwise self-evident meaning of "confidential" in section 8.11(a). Specifically, BLT argues that the use of the term "but not made publicly available" in sub-part (iii)—the catchall provision of this subsection—implies that any materials that come within sub-parts (i) or (ii) are protected from use by Tourondel even if shown to the public. (Pl.'s R.56 Mem. of Law at 11). This textual argument is a non-starter. As we have observed, sub-parts (i) and (ii) list in considerable detail a host of types of documents or information that are exemplars of confidential business materials. Since they are listed as examples of "confidential information", there was no need to add a qualifier that they must not have been publicly disclosed, because that was implicit in the category of which they are examples. Subpart (iii) plainly differs in this pertinent respect because, as a catchall, it does not identify or describe any types of information, but rather refers generically to "other tangible and intangible property". Given the generality of that phrase, it is obvious that the contractual

---

17. "Confidential" is defined as: "marked by intimacy or willingness to confide"; "PRIVATE, SECRET"; "entrusted with confidences"; "containing information whose unauthorized disclosure could be prejudicial to the national interest". *Id.*

18. The term means "intended to be kept secret." *Id.*

19. "Confidential" is defined as "secret, often in a formal, business or military situation." *Id.*

20. "Confidential" is defined as "spoken or written in secret and intended to be kept secret". *Id.*

reference to the absence of public disclosure in subpart (iii) was intended to qualify it for inclusion in the universe of protected information.

In this regard we note that plaintiff's alternative reading would make nonsense of subsection 8.11(a). If, as BLT posits, the many listed, normally confidential business documents specified in subparts (i) and (ii) need not in fact be confidential—notwithstanding the plain meaning of that word—then there is no obvious explanation for why, in contrast, a generic category of "other tangible and intangible property" must be kept secret to be protected. In the absence of any cogent explanation, or indeed any explanation, by plaintiff for this anomalous result, we conclude that BLT has not demonstrated any triable dispute as to the meaning of "confidential information".

■ In short, section 8.11(a) applies only to information that has not been made public, at least by plaintiff. With that point settled, as we have noted, defendants argue that the menu that they use cannot be deemed in breach of Tourondel's contractual obligations, for two reasons. First, they point out that the menu is not confidential, that is, it is of course presented to the public every day. Second, they argue that if the information at issue is not confidential but may qualify as "proprietary"—since there is no contractual requirement that "proprietary materials" be secret—the breach claim fails because the contract does not bar Tourondel from using proprietary materials; rather, subsection 8.11(c) precludes only his use of "confidential information". (Defs.' R.56 Mem. of Law at 5; Defs.' R. 56 Reply Mem. of Law at 6). For reasons to be noted, we conclude that these arguments do not justify summary judgment on this aspect of plaintiff's contract-breach claims.

On the first point, there is no question that plaintiff's menus are not themselves confidential. That does not, however, establish that in designing his competing menus Tourondel did not use confidential information, as defined in the contract with BLT. If, for example, he relied on non-public marketing or other studies created for BLT in determining a winning combination of offerings, or catchy names for the dishes or optimal pricing for this fare, he could be found to have breached the provision barring use of confidential information. It is of course true that plaintiff would bear the burden of demonstrating that Tourondel in fact used such protected information, but defendants' summary-judgment motion does not target that evidentiary question; indeed, it presumably could not persuasively do so in mid-discovery, before any depositions have been conducted. Rather, defendants rest their argument solely on the notion that the menus themselves are not confidential, a point that, while true, is not dispositive of this version of plaintiff's breach claims. In sum, defendants have not carried their initial burden on their motion by pointing to evidence that conclusively resolves a fact material to plaintiff's claims.

Apart from this failing, defendants also cannot prevail for a separate reason. As noted, they argue that the menu is not "confidential information", and they assert that even if it (or any other data relied on Tourondel) constituted "proprietary materials", his use of them cannot amount to a breach because the contract bars the use only of "confidential information" and not "proprietary materials". To prevail on this theory, defendants would have to demonstrate beyond triable dispute that the contractual ban on use of corporate information or materials was so limited. That in turn would depend on their establishing that section 8.11 was unambiguous in this respect or, even if ambiguous, that its

meaning was established beyond dispute by parol or equivalent evidence.

Defendants offer no parol evidence and rely solely on the fact that section 8.11(c) prohibits the use of the LLC's confidential information and does not explicitly extend that prohibition to the proprietary materials. Were this the only provision that dealt with the Employee Members' obligations regarding corporate materials, it might well be found unambiguously consistent with defendants' position that there is no contractual bar to Tourondel using "proprietary" · information belonging to BLT. That purported lack of ambiguity does not account, however, for the potential import of subsection 8.11(b)(iv), which appears as part of the provision (§ 8.11(b)) that specifically addresses "Proprietary Materials". It specifies that upon the departure from BLT of an Employee Member, he must "deliver to the Company (and shall not keep in his possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed or received by him in the course of his holding Membership Interests of the Company or otherwise belonging to the Company. . . ." This point is reinforced by subsection 8.11(e), which similarly requires surrender of all "Company Property", which includes, "without limitation", not only "all Confidential Information", but also "documents, correspondence, notebooks, reports, computer programs, names of full-time and part-time employees and consultants, and all other materials and copies thereof . . . relating in any way to the business of the Company in any way obtained by [the Employee Member] during the period of his Position with the Company."

These provisions may fairly be interpreted to say—indeed, they strongly suggest—that the former Employee Member is required to refrain from using not only "Confidential Information", but all other data developed or received by him during his tenure with BLT. This follows from the fact that he is required to surrender to BLT not only original documents and materials, but all copies, and is prohibited from passing them on to anyone else. The fair import of these requirements is that he may not use such materials after his termination from the LLC. Otherwise stated, this set of provisions permits the inference that Tourondel is barred from using information that may be considered "Proprietary Materials" under the contract. If so, his use of the BLT menu (arguably a proprietary material) or any underlying documents that led to the inclusion in the BLT menu of the assertedly copied information could be found to constitute a contractual breach. Since the terms relevant to the status of proprietary materials are ambiguous on this point, summary judgment may not be granted on the basis of defendants' reading of these provisions.

In sum, defendants' motion for summary judgment on the contract claims pertaining to the Tourondel menus is denied except in the limited respect noted.

### 2. *The Lanham Act Claim*

The second prong of defendants' summary-judgment motion targets plaintiff's claim under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). That claim, as articulated, addresses only defendants' use of the BLT menu, and asserts that their alleged borrowing of the substance of plaintiff's business model, as reflected in the menu—specifically, the choice of dishes to present, the imaginative naming and descriptions of the dishes and their pricing—constitutes prohibited unfair

competition in the form of trademark infringement, trade-dress infringement, false designation of origin or reverse false designation of origin. (2d Am. Compl. ¶¶ 88–98). Although the pleading left open the precise contours of this claim, in responding to defendants' current motion, plaintiff invokes solely the theory that the cited aspects of its menu constitute a protectible trade dress. (Pl.'s R.56 Mem. of Law at 13–19).

In attacking this claim, defendants argue two points. First, they assert that by assigning the BLT registered trademarks and associated goodwill to Tourondel—as required by the contract—when he left the LLC, plaintiff lost any goodwill in its business, and hence cannot assert any trade-dress protection. Second, defendants note that the validity of a claimed trade dress must be supported by proof not only of inherent or acquired distinctiveness, but also of non-functionality. On this point they argue that plaintiff does not, and cannot, demonstrate non-functionality because the menu is in fact functional. (Defs.' R.56 Mem. of Law at 12–18; Defs.' R.56 Reply Mem. of Law at 12–16). Plaintiff, of course, contests both points. (Pl.'s R.56 Mem. of Law at 12–19).

■ We start by noting that defendants' motion does not challenge one key assumption on which plaintiff's current version of this claim is based—that the meal choices, item names and descriptions and the prices included on a restaurant menu may, by themselves, constitute a protectible trade dress if they are not functional. Although trade dress is commonly described as focussed on the impression created by the physical appearance of a product or its packaging, *see Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir.1997), there is certainly support in some caselaw for the notion that a restaurant may ac-

quire a protectible interest in the appearance that its premises convey and indeed may even be able to establish that the physical appearance of its menu is a protectible trade dress. *See, e.g., Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998, 1002–05 (9th Cir.2004); *see also Cold Stone Creamery, Inc. v. Gorman*, 361 Fed. Appx. 282, 284–85 (2d Cir.2010) (injunction bars use of plaintiff's trade dress in ice cream store; injunction includes menu boards).

In this case there is no suggestion that defendants' menus bear a physical resemblance to plaintiff's; indeed, the exhibits proffered by the parties reflect that they do not. (Haber Decl. Exs. B–F). Rather, BLT contends that defendants' menus include most of the same dishes as are found in the BLT menus and contain very similar or identical names and descriptions of them and also include prices that are in large measure identical to those listed by plaintiff for the same items. (Pl.' R.56 Mem. of Law at 18 (citing Haber Decl. ¶¶ 19–29)). Whether that type of mimickry can constitute an infringement of a trade dress is perhaps open to question, but since defendants' motion does not raise that issue, we need not address it here.

■ As for the arguments that defendants do invoke, we turn first to the effect of plaintiff's assignment of the registered BLT trademarks and attendant good will. The assigned marks are service marks, in the form of the names BLT and Bistro Laurent Tourondel. *See* 15 U.S.C. § 1127 (defining "service mark"). Defendants seem to argue that because the assignment included good will-an addition necessitated to ensure that the assignment was not an invalid transfer of a bare trademark, unconnected to a business—it deprived plaintiff of the ability to claim any trade-dress protection in its continuing, contractually-protected restaurant business. (Defs.'

R.56 Mem. of Law at 12–13). We disagree.

The traditional common-law rule prohibited assignment of a trademark "in gross", that is, shorn of any aspect of the business that it had previously identified. That policy, which is intended to avoid consumer confusion, *see Marshak v. Green*, 746 F.2d 927, 929 (2d Cir.1984) ("Use of the mark by the assignee in connection with a different good will and different product would result in a fraud on the purchasing public . . . ."), is reflected as well in the Lanham Act. 15 U.S.C. § 1060. *See, e.g., Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69–70 (2d Cir. 2008); *Marshak*, 746 F.2d at 929. An impermissible assignment in gross is avoided if the assignor conveys the assets of the business to the assignee together with the trademarks, provided that the assignee is going to use them in a business that will provide essentially the same type of products or services as the assignee had done in the past. *See, e.g., Pan Am. World Airways, Inc. v. Flight 001, Inc.*, 2007 WL 2040588, \*9 (S.D.N.Y. July 13, 2007). An assignment of a trademark may also satisfy the common-law requirement if the assignor transfers the good will of the business in lieu of its assets. *See, e.g., Pilates, Inc. v. Current Concepts, Inc.*, 120 F.Supp.2d 286, 310–11 (S.D.N.Y.2000) (discussing validity of assignments without transfer of assets). In a slight shift from the common-law rule, the Lanham Act, in addressing the assignment of registered trademarks, authorizes assignment of good will that is associated solely with the trademark and not with the entirety of the business. 15 U.S.C. § 1060(a)(1) ("A registered mark . . . shall be assignable with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark."). *See,*

*e.g.*, Altman & Pollack, 3 *Callmann on Unfair Comp., Tr. & Mono.* § 20.44 (4th Ed.) (Westlaw database CALLMANN). An additional complication may be encountered when, as here, the owner of a trademark assigns it and the assignee then licenses it back to the assignor. In such a circumstance, the transaction may be valid if the assignee/licensor retains adequate quality control to ensure against public confusion. *Id.* & n. 32 (citing *inter alia Visa U.S.A., Inc. v. Birmingham Trust Nat'l Bank*, 696 F.2d 1371, 1377 (Fed.Cir. 1982)); *accord E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir.1992) (citing *Star–Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir.1985)).

In this case, the contract provided that when Tourondel departed from BLT, plaintiff would assign him the registered marks BLT and Bistro Laurent Tourondel, and that Tourondel would license BLT to use those marks in connection with their existing restaurants and those under construction at the time. (Benschar Decl. Ex. A § 8.12 & "Amendment 2" at p. 6 [BLT000067] ). The assignment contract provided that the trademarks were assigned "along with the good will of the business symbolized by such marks". (Benschar Decl. Ex. H). The contract did not make clear whether the term "good will" was intended to represent the entire good will of the business or simply the good will associated with the assigned marks, although the latter appears plausible in view of the stated intention of the contracting parties that BLT would continue to operate its current business and even use the assigned trademarks under the specified license.

Those assigned trademarks represent the identity of the BLT or Bistro Laurent Tourondel business as it was known to the consuming public. Hence the assignment

of the good will ensures that plaintiff may not claim any non-contractual intellectual-property entitlement to being identified as a BLT or Bistro Laurent Tourondel establishment and that its protection in that respect is contractual in nature. *Cf. The Heisman Trophy Trust v. Smack Apparel Co.*, 637 F.Supp.2d 146, 154 n. 4 (S.D.N.Y. 2009) (noting that a plaintiff "may ... enforce contractually granted rights to protection of a mark even where that mark is not protectible under trademark law"). Plaintiff does retain a contractual right to this identity for its restaurants in operation or in construction at the time of Tourondel's departure from the LLC, but, as defendants note, that right is a product of a license granted under the contract, and that license does not create a right in plaintiff to enforce intellectual-property interests in the name of the restaurants. *See, e.g., Calvin Klein Jeanswear Co. v. Tunnel Trading*, 2001 WL 1456577, *4 (S.D.N.Y. Nov. 16, 2001) ("Where a licensing agreement does not grant the licensee a property interest in the mark or otherwise assign to the licensee the registrant-licensor's ownership rights, the licensee, even if exclusive, cannot enforce the mark under [section 32 of the Lanham Act].").[21]

Where defendants appear to go astray, however, is in their assertion that the assignment of the trademarks and associated good will also bars plaintiff from asserting any intellectual-property rights that are not specifically associated with the name of plaintiff's restaurants or business, includ-

ing the right not to have the trade dress, if any, in its menus infringed. It is of course possible, if plaintiff assigned all good will in its business to Tourondel, that it may be stripped of any intellectual-property rights in that business (although defendants cite no legal authority for that proposition). As we have noted, however, the scope of the good will transferred is ambiguous in the contract and may be read as limited to the good will associated with the name and not other elements of the business. That distinction appears significant since plaintiff does not complain that defendants' menus use the names BLT or Bistro Laurent Tourondel. Rather, it asserts that the striking similarities in the selection of menu items, and their monikers, descriptions and prices infringe the right of its business to have its own identity in terms other than the business name. Defendants cite no legal authority for the proposition that in the current circumstances, and by virtue of the trademark assignment, they are free to use deliberately confusing business elements—other than the name and its associated elements—to divert customers from plaintiff's contractually protected restaurants.

This point may be illustrated by hypothesizing that, after transferring the trademarks and associated good will, plaintiff, instead of using the name BLT for its restaurants, had chosen an entirely different name but had continued to use menus that were distinctive in appearance and

21. We should note that the case law in this area is not clearly settled. The Lanham Act provides that an action for trademark infringement may only be brought by the "registrant" of the trademark. 15 U.S.C. § 1114(1). That term is defined to include "legal representatives, predecessors, successors, and assigns" of the registrant. 15 U.S.C. § 1127. While some courts have, based on this restriction, denied standing even to exclusive licensees, others hold the

view that standing is available to an exclusive licensee who has a property interest in the trademark. *See Telebrands Corp. v. Del Labs., Inc.*, 719 F.Supp.2d 283, 292–93 (S.D.N.Y. 2010) (discussing cases). Neither party addresses this issue, but we observe that under either standard plaintiff would have no standing under the existing license. (*See* Benschar Ex. A § 8.12 and "Amendment 2" at 6 [BLT 000067]).

substance. In that circumstance, defendants would presumably not be permitted to copy the appearance of those menus merely because they had the superior right to use the original restaurant name. *Cf. Tecnimed SRL v. Kidz–Med, Inc.,* 763 F.Supp.2d 395, 400–04 (S.D.N.Y.2011) (addressing dispute between manufacturer and distributor—which had the right to use manufacturer's trademark—as to which of them had ownership of the corresponding trade dress).

In short, we reject, at least on the current record, defendants' contention that the assignment of the trademarks and attendant good will deprives plaintiff of the ability to assert trade-dress protection in the menus.[22]

Defendants' alternate argument on this motion concerning the Lanham Act claim is that plaintiff cannot demonstrate non-functionality, which is required for an enforceable trade dress. In pressing this point, defendants note that the proponent of the trade dress bears the burden of proof on non-functionality, and they argue that the menu is necessarily functional. (Defs.' R.56 Mem. of Law at 13–18; Defs.' R.56 Reply Mem. of Law at 14–16). This argument is in large measure unpersuasive.

■ We start with the standards for assessing functionality in the trade-dress context. The Supreme Court has observed that " 'in general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.' " *TrafFix Devices, Inc. v. Mktg. Displays, Inc.,* 532 U.S. 23, 32, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (quoting *Qualitex Co. v. Jacob-*

*son Prods. Co.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995); *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 850, n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). In the case of what the High Court has referred to as asserted "aesthetic functionality", *id.* at 33, 121 S.Ct. 1255, "a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.' " *Id.* at 32, 121 S.Ct. 1255 (quoting *Qualitex Co.,* 514 U.S. at 165, 115 S.Ct. 1300); *see id.* at 32–33, 121 S.Ct. 1255.

Applying these concepts to what we understand is the content-based definition of a trade dress espoused by plaintiff is not straightforward, but we cannot say that the features that BLT has highlighted from its menu are indisputably functional in either sense. Putting to one side the notion that defendants misappropriated plaintiff's choice of items to put on the menu and their prices, we note that both the fanciful names that both sides adopted for those dishes, as well as the descriptions of those items—which are strikingly similar if not identical in both sides' menus—cannot fairly be described as functional. These names and manner of description are plainly not "essential to the use or purpose of the" menu or the operation of the restaurant and also cannot be said to "affect [ ] the cost or quality of the" menu or food items. As for whether the "exclusive use of [the menu] would put competitors at a significant non-reputation-related disadvantage", defendants do not frame such a question in their briefing of their motion, much less proffer an evidentiary basis to carry their initial Rule 56 burden on that specific issue.

As for the choices of items and prices, even though these elements of a menu

---

**22.** Although the contract does not provide for quality control by defendants over the performance of BLT, we need not address wheth-er that undermines the contractual arrangement for an assignment and lease-back, since none of the parties raise this issue.

would certainly seem in the abstract to be functional in the sense that they serve a non-aesthetic and non-source-identifying purpose, again defendants fail to address these specifics in their motion, and hence fail to carry their initial Rule 56 burden. Moreover, we note that plaintiff's evident theory is that it is the combined effect of these elements that constitutes the trade dress and that the combined use of them by plaintiff satisfies the test of non-functionality. Since defendants do not address this point either, it cannot be the basis for awarding them summary judgment.

### CONCLUSION

For the reasons stated, we deny defendants' motion to dismiss, grant plaintiff's motion to amend, and deny defendants' motion for partial summary judgment except insofar as we have deemed a portion of the disputed contract to be unambiguous. Plaintiff's Second Amended Complaint is deemed served on defendants. They are to serve their responses to it within twenty-one days.